ANTHONY SCHMITT, JR. AND OTHERS v. EAGLE ROLLER
MILL COMPANY AND OTHERS.
JOHN C. SIEBENBRUNNER AND OTHERS, INTERVENERS.[1]

March 12, 1937.

No. 30,995.

[1]Reported in 272 N. W. 277.

*Kingman, Cross, Morley, Cant & Taylor* and *Dempsey & Dempsey,* for appellants.

*Somsen, Dempsey, Johnson & Somsen,* for respondents Eagle Roller Mill Company, Edgar Veeck, and Gerhard Spaeth.

*Fowler, Carlson, Furber & Johnson* and *C. A. Taney, Jr.,* for respondents Charles Taney Silverson, Katherine M. Silverson, and C. A. Taney, Sr.

*Flor & Reim,* for interveners.

HILTON, JUSTICE.

Appeal from an order denying plaintiffs' motion for a new trial in an action brought by and on behalf of the life beneficiaries of a trust to compel the declaration of a dividend on the shares of stock constituting the trust *res.*

The plaintiffs are Anthony Schmitt, Jr., one of the two trustees; Katherine S. O'Donnell and Charlotte S. Foreman, the life beneficiaries, and Oliver C. Foreman, husband of Charlotte S. Foreman and one of the directors of the corporation. The defendants are the Eagle Roller Mill Company, the corporation concerned; C. A.

384

Taney, Sr., another of the trustees; Katherine M. Silverson, wife of the settlor of the trust; Charles Taney Silverson, son of the latter and the remainderman of the trust; Edgar Veeck and Gerhard Spaeth; and John C. Siebenbrunner, B. J. Fast, George L. Schmidt, and George H. Vetter as interveners on behalf of the defendants.

The Eagle Roller Mill Company, located in New Ulm, Minnesota, was incorporated in 1891 with an original authorized and issued capital stock of $300,000 represented by 3,000 shares of common stock of the par value of $100 each. Charles Silverson is appropriately termed the "founder" of the company. With his brother William and the plaintiff Anthony Schmitt, Jr., he organized the business. It was an outstanding success. From 1891 to 1905 it earned $849,859.94, of which $378,900 was paid out in dividends, the balance being carried into the surplus account. The articles of incorporation were then amended and the capital account increased to $1,200,000 by the issuance of $600,000 in preferred stock, to draw six per cent cumulative dividends, and by $300,000 additional in common stock; both types were of the par value of $100 per share. This stock was all issued by outright donation thereof to the holders of the old common stock. The surplus account not being sufficient to offset the increase in the capital structure thus made, an item of $450,000 was arbitrarily set up as good will. A provision of the articles required that a reserve account of $100,000 be set up to guarantee the payment of the dividends on the preferred stock as they accrued. That was done and has been kept up to date. Only the common stock has voting rights.

From 1905 until 1912 the company had earnings of $756,860.48, $100,000 of which was used to create the reserve for preferred stock dividends; a portion of the remainder was paid out in common stock dividends. At the end of 1912 there was in the surplus account, allowing full credit for the good will item, the sum of $367,457.72. Charles Silverson died in that year, and there was received as insurance because of his death $285,711.05. This was not included in the surplus account above stated.

This litigation arises out of a trust set up by Charles Silverson for the benefit of Katherine S. O'Donnell and Charlotte S. Foreman,

plaintiffs and his daughters by a first marriage, and a son, Charles Taney Silverson, one of the defendants, he having been born of a second marriage. After making several bequests to his wife, Katherine Silverson, Charles Silverson, by his will, directed that all of the common stock owned by him, except such as might be needed to satisfy specific gifts, be placed in trust. One-third of the income therefrom was to go to each of his daughters during their respective lives, the remainder to the descendants of each, if any there should be. The other third was settled on his son, Charles Taney, who on reaching the age of 25 was to receive his one-third outright. This he received in 1933. There were provisions for lapses, none of which are important here except that one provided that if either of the daughters died without leaving descendants the remainder of the trust estate was to go equally to the son Charles Taney and the surviving daughter, except for the amount of $1,000 which could be willed by each of the daughters to each of their respective husbands. Should both daughters, leaving no issue, predecease Charles Taney Silverson, then the remainder of the entire trust *res* not otherwise provided for was to go to him. The two daughters are now both over 50 years of age, have been married over 20 years, and neither has any children. The son, at the time of the trial, was 26 years of age, married, and had one child. In the absence of unforeseeable events, it is very likely that the remainder of the entire trust will go to the remainderman. The defendant Eagle Roller Mill Company all along has been especially prosperous. It has paid on an average over 15 per cent annually in dividends on its common stock since the death of Charles Silverson in 1912. As a result each daughter has received more than $30 every day since the trust was created.

From 1912 to 1925 William Silverson actually controlled the company because of the fact that, by the will, he was appointed trustee with power to vote all the shares comprising the trust *res,* a total of 2,347. Entire harmony prevailed in the company management during that period. There were generous profits, totaling $2,874,603.53, of which $1,364,131.95 was paid out in dividends,

leaving a surplus of well over $1,000,000, including the good will item. In 1919 the company commenced the policy of buying up some of its preferred stock as authorized by its articles. By 1934 those purchases had resulted in the company having 2,697 shares of such stock in its treasury in addition to 1,080 shares of common stock that had been bought back.

Commencing in 1925 internal dissension developed as to who should control the company. One H. L. Beecher and his associates, constituting a so-called New Ulm group, obtained control, the stock held in trust being voted on their behalf. The other group, called the Minneapolis group (as most of its members lived in Minneapolis), although opposed to Beecher most of the time, made his election to the presidency of the company unanimous. The lower court found as a matter of fact that during the period Beecher controlled the company, i. e., 1925 to 1933, his management and policies "met with the full approval of the plaintiffs Katherine S. O'Donnell and Charlotte S. Foreman and also the plaintiff Anthony Schmitt, Jr. As will subsequently appear, there is ample support for that finding. The policies pursued by Beecher as to the payment of dividends and the proportion of profit allowed to accumulate in the surplus account were not materially different than that about which the plaintiffs now complain, as hereinafter will more fully be set out. It was not until the time this litigation was commenced, 1934, almost ten years after the policies followed by Beecher were instituted, that the plaintiffs, despite their claims to the contrary, first seriously complained about the amount of dividends being paid by the company. In matters of this kind, where corporate action is concerned, it is essential that the parties claiming to be aggrieved be not guilty of delay. To do so works to the disadvantage of all concerned. The company planned its course for years ahead without material objection from the now complaining parties and even with their apparent tacit approval as to most matters. Now to assert that they were dissatisfied is inexcusable in the absence of any justifiable reasons therefor.

Beecher, who died in 1933, was able to hold control of the company from 1925 to 1933 because another of the trustees, there being

three in number, was friendly to his views and management and voted with him. This period, despite some large losses, was also one of fine earnings, the balance sheet showing them to be $1,258,294.52, which included an amount of $142,489.80 received as insurance on the death of Beecher. The surplus account at the end of the period showed a balance of $1,001,513.21. In 1928 the good will item was written down to only one dollar; thus the original amount was not included as part of the 1933 surplus. Dividends during the period amounted to $893,972.90. According to the balance sheet of the company for 1934, the year this action was commenced and immediately after Beecher's death, there were earnings for that year of $145,992.12 in addition to the insurance received as a result of Beecher's death. Dividends paid for the year were $254,016.28; 300 shares of common stock were also purchased from the Beecher estate at $170 a share.

Since Beecher's death there have been only two trustees, as his place has never been filled. Apparently the two cannot agree, for the trust stock has not been voted. The plaintiff Anthony Schmitt, Jr., a small stockholder, and the defendant Charles Taney, Sr. are now the trustees. Shortly after the death of Beecher, the Minneapolis group obtained stock control by voting as a unit the 782-1/3 shares of stock held by the son, Charles Taney Silverson, and the 1,043 shares of his mother, Katherine M. Silverson, with various other shares held by their relatives, amounting in all to 44.6 per cent of the outstanding common stock. The New Ulm group controlled 1,130 shares, or 22.9 per cent, and there were 1,564-2/3 shares in the trust, or 31.8 per cent. Obviously, were the stock held by the New Ulm group and that held in the trust to be combined, control of the company could be effected. However, there has been no attempt to seek the appointment of a third trustee so as to enable the taking of any action. The Minneapolis group elected the son, Charles Taney Silverson, to the board of directors along with other directors favorable to his viewpoint.

This action was brought to compel the payment of larger dividends. The real parties in interest as plaintiffs are the two daugh-

ters, who undoubtedly are fearful that they will have no issue and that the corpus of the trust eventually will go to their half-brother, Charles Taney Silverson, who is the remainderman. It is their claim that he has gained control of the company by enlisting the aid of his mother, owning 1,043 shares of the common stock, and the other directors owning a smaller number of shares, merely to deprive them of their just income as beneficiaries of the "entire income" from the trust. They point out that if the earnings of the company are not distributed but are allowed to accumulate as surplus there is a possibility that those earnings might pass to the remainderman as part of the corpus.

In bringing this action plaintiffs ask that they be awarded any one of three kinds of relief: (1) That the defendant company be compelled to declare a cash dividend of over $300,000; or (2) to distribute the stock held in its treasury; or (3) to issue new common stock as was done in 1905. In case of the last stated sought for relief it is plaintiffs' thought that they, as life beneficiaries, would be entitled to the stock so issued as income of the trust under the decision of this court in Goodwin v. McGaughey, 108 Minn. 248, 122 N. W. 6. The lower court held that plaintiffs were entitled to no relief in this action.

Although the directors of a corporation occupy a fiduciary relationship toward the stockholders, Seitz v. Union B. & M. Mfg. Co. 152 Minn. 460, 189 N. W. 586, 27 A. L. R. 293; Jones v. Missouri-Edison-Elec. Co. (C. C. A.) 144 F. 765; Albert E. Touchet, Inc. v. Touchet, 264 Mass. 499, 163 N. E. 184, the declaration of a dividend rests in their sound discretion, and one will not be compelled unless they act fraudulently, oppressively, unreasonably, or unjustly. Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. ed. 525; Liebman v. Auto Strop Co. 241 N. Y. 427, 150 N. E. 505; Long v. Rike (C. C. A.) 50 F. (2d) 124, 81 A. L. R. 521. The lower court found that the board of directors of the defendant company "did not abuse its discretion and acted fairly, honestly, reasonably and in good faith and for the best interests of the corporation and its stockholders, and with no thought or purpose of oppressing or injuring

the plaintiffs or anyone else or of depriving anyone of their rights." The usual rule maintains that the findings of fact made by the trial court will be sustained unless manifestly and palpably contrary to the evidence. Sommers v. City of St. Paul, 183 Minn. 545, 237 N. W. 427; Holtorf v. Rochester Farmers Mut. F. Ins. Co. 190 Minn. 44, 250 N. W. 816; C. L. Colman Lbr. Co. v. Mironowski, 174 Minn. 507, 219 N. W. 758. It requires a clear showing before a court is justified in interfering in corporate matters. The board of directors are selected for the purpose of management, and a court will hesitate to interfere therein if there is any doubt of the necessity therefor. See note, 55 A. L. R. 8, and cases cited. This case is one where an eminently successful concern is being asked to declare a dividend by a group that represents only the life interest in 31.8 per cent of the outstanding common stock. The company has paid dividends averaging well over 15 per cent every year since the trust was created. It has had a fine financial record. Its credit is easily due only to the fact that it has maintained the policy of keeping a large cash reserve and surplus account. That the management has been extremely successful is well illustrated by the fact that the company came through the depression in just as good, if not better, financial condition than it was in years prior thereto.

Plaintiffs' claim is bottomed on their assertion that the surplus of the defendant company as compared with that of 1912 is so out of line that it is self-evident that the directors have not acted in good faith. Plaintiffs point out that, excluding the good will item and including the life insurance received, the earnings accumulated and not paid out since the trust was created total $934,517.61, and urge that as the life beneficiaries of 31.8 per cent of the "income" of the stock they are legally entitled to that proportion of those earnings at this time, for there is danger that they will unjustly go to the remainderman. Defendants claim that in computing the earnings accumulated since 1912 it is perfectly proper to take into account the loss on the item of good will which was written off in 1928. Plaintiffs adopt a contrary position. Recently many corporations finding themselves in a favorable financial position have

adopted the policy of writing off good will, as it is not a liquidable asset in most instances. See Conyngton, Corporation Procedure, p. 783. This is especially true where a substantial surplus has been acquired and the good will item was originally adopted to offset an overcapitalization, as was the case of the defendant company in 1905. No evidence of bad faith on part of the directors can be worked out of the action so taken. Further, it was not until almost six years after the good will item had been written off that the plaintiffs made any complaint thereto. At the time it was done all the directors approved, including Dr. Foreman, the husband of one of the plaintiffs. Disapproval now is somewhat belated.

The insurance received on the death of Beecher amounted to over $142,000 and that on the death of Charles Silverson over $285,000. There is dispute as to whether this should be considered as part of the earnings. Some authorities hold it to be an increase in the capital account as it is not a reoccurring item, but others take the view that the premiums are paid as part of the operating expenses and therefore are to be considered as earnings. See In re Estate of Bishop, 36 Dauph. 17. Here it is immaterial, for it does not go to the fact question as to whether the directors have acted in bad faith, oppressively, or unjustly.

It is obvious that if plaintiffs were to succeed in getting their claimed proportion of those earnings declared as dividends the defendant company also would be obligated to declare dividends on the other stock, thus depleting by 100 per cent the entire reserve built up since 1912. In order to warrant interference by a court in the action of the directors it must be shown that they not only acted in bad faith but also that there are surplus profits to divide which can be separated from the necessary working capital without detriment to the interests of the company. Gehrt v. Collins Plow Co. 156 Ill. App. 98; Hunter v. Roberts, Throp & Co. 83 Mich. 63, 47 N. W. 131. Here the lower court found that "all the assets and property which the company now owns or possesses are reasonably required for the efficient and proper conduct of its business."

There is no presumption that the directors acted in bad faith or unjustly. The finding of the lower court to the exact contrary

seems to have adequate evidence to sustain it. Plaintiffs' contention, when scrutinized, is principally predicated on the one theory that defendant company, because controlled by a group which is headed by the person who apparently will receive the residue of the trust estate, is building up its surplus account so that that person, and not the plaintiffs, will receive the entire earned and undistributed income. The circumstance that there is a large surplus is not conclusive as to that being the situation nor does it necessarily indicate any bad faith or unreasonable action. "The mere fact that a corporation has surplus profits out of which a dividend might lawfully be declared is not of itself sufficient ground for a court of equity to compel the directors to make a dividend, for they have a right to use surplus profits to extend the business of the corporation, or to make improvements, and even to provide a surplus fund, if it is to the interests of the corporation to do so, * * *." 11 Fletcher, Priv. Corp. (Perm. ed.) § 5325.

Defendant's business, that of milling, is a very fluctuating one. Large purchases of raw materials must be made at seasonable times of the year, resulting of course in unused surplus at other times. Such situation enables the more easy borrowing of money when it is needed and at better terms. This is well illustrated by the circumstance that up to 1925 the company could not obtain loans from sources able to furnish large sums of money unless its officers gave their personal guarantee of payment. Since that time the financial condition of the company, because of its large surplus, etc., has been so good that it has been able to obtain necessary loans on its name alone. This court should not compel any action that might cause a reversion to the former conditions.

A cash dividend would of course impair the working capital of the company. The balance sheet for 1934 shows it to have been $1,178,713.59. For many years past it has been over $1,000,000, and its officers testified that such an amount was necessary to the company's business. The cash balance on hand just prior to this trial was $238,151.89, whereas the average since 1912 was slightly more than that amount. The inventories now are lower than has

been generally the situation for the 22-year period, *i. e.*, 1912 to 1934. There is not enough cash on hand even to pay the cash dividend that plaintiffs seek. To do so the company would be required to borrow money or to liquidate some of its inventory items. That would be an added expense and a distinct detriment. Certainly the directors cannot be held guilty of bad faith under the circumstances disclosed. Conditions now are much different than they were in 1912. The milling industry is not now monopolized by the Northwest as it was at that time. The large centers of population in the East and favorable freight rates have caused much of the business of this industry to go elsewhere. There is evidence that because of this change in conditions mills situated as is the defendant company must offer better credit inducements to their customers than formerly. This requires a large surplus. There is justification then in the defendant having even a larger reserve than in 1912. Plaintiffs have assumed throughout this litigation that the 1912 average is the only criterion by which the action of the directors can be tested. That does not necessarily follow. A larger reserve today is no evidence of bad faith in this case.

As an alternative to a cash dividend plaintiffs ask that the directors be compelled to distribute the common and preferred stock held in the treasury of the company. Perhaps that would be an easier method were any distribution to be required. However, there being ample support for the finding that the directors did not abuse their discretion as to the declaration of a cash dividend, that finding is determinative here. To distribute the preferred stock would add a fixed yearly dividend charge of $16,000 to the company's expense. It would give the outstanding preferred stockholders less security because of this added charge. It has been the policy of the company to recall, by purchase, its preferred stock whenever possible. The articles specifically provide therefor. Certainly a continuation of this procedure, instituted by the founder of the company and the settlor of the trust, offers no just cause for complaint. It must have been the intention of the settlor that the preferred stock was not to be permanently outstanding. Undoubtedly this thought was in his mind when the will was drawn.

In any event, plaintiffs have receded somewhat from the stand first taken and are less insistent upon a cash dividend and upon their claim for distribution of the treasury preferred stock. Their principal demand apparently is that the company be compelled through its directors to issue new common stock in an amount sufficient to capitalize much of the surplus account. It is argued that this cannot possibly harm the company, for by this procedure all of its assets will remain intact, the liabilities will remain the same, and there will result only a simple bookkeeping entry changing part of the surplus account over into the capital account. See Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. ed. 525. Such a dividend takes nothing from the corporation and of course in no way depletes its assets. See Humphrey v. Lang, 169 N. C. 601, 86 S. E. 526, L. R. A. 1916B, 626. The corporation maintains just as good a financial position as before. Williams v. Western Union Tel. Co. 93 N. Y. 162; 11 Fletcher, Priv. Corp. (Perm. ed.) § 5362. Generally nothing would be added to the interest of the individual stockholders thereby, for the original holding merely would be represented by more certificates. Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. ed. 525; see Boston Safe Deposit & Trust Co. v. Adams, 219 Mass. 175, 106 N. E. 590. However, under the rule adopted in this state in Goodwin v. McGaughey, 108 Minn. 248, 122 N. W. 6, a stock dividend is treated as income and would go to the plaintiffs here, the life beneficiaries of the trust. To that extent a distribution of a stock dividend would change the relative position of the stockholders in the defendant corporation.

There is disclosed no more reason for compelling the payment of a stock dividend than there would be for any other kind of a dividend. In either case, the finding that the directors have acted in good faith stands. Also, there are other considerations that must be borne in mind in this regard. Except in those corporations having wasting assets, such as mining and oil companies, see Excelsior W. & M. Co. v. Pierce, 90 Cal. 131, 27 P. 44; Van Vleet v. Evangeline Oil Co. 129 La. 406, 56 So. 343, in the absence of statutory provisions, a corporation ordinarily may not pay dividends out of capital.

Coleman v. Booth, 268 Mo. 64, 186 S. W. 1021; Staats v. Biograph Co. (C. C. A.) 236 F. 454, L. R. A. 1917B, 728; People ex rel. Farnum v. San Francisco Sav. Union, 72 Cal. 199, 13 P. 498; Siegman v. Electric Vehicle Co. 72 N. J. Eq. 403, 65 A. 910. To compel distribution of common stock very possibly might, although not in the immediate future, considering the present financial condition of the company, impair not only the return of the preferred stockholders but also seriously restrict the right of the directors to declare cash dividends on the common stock in the future. It is clear that the issuance of more common stock will capitalize, to the extent of the stock issued, the surplus that can now and which might in the future be used for the payment of dividends. The surplus so capitalized could not then be used for the payment of dividends. The new Minnesota corporation code, L. 1933, c. 300, § 21, subd. II, 3 Mason Minn. St. 1936 Supp. § 7492-21, in common with the corporation codes of other states, permits the payment of cash dividends only out of earned surplus, paid in surplus and net earnings for the current or preceding fiscal years under certain conditions. By increasing the capital account, as demanded by plaintiffs, other stockholders, who might in the future be desirous of cash dividends, could not obtain them even should the directors believe that the condition of the company warranted the declaration of one, for to do so might encroach upon the capital structure. The company, very possibly, could become capitalized to an extent not at all required by its business were such action to be required. These plaintiffs have no right to compel existing stockholders to increase their capital investment in the company. Such would be the result as the surplus no longer would be available for dividends. Michaels v. McLaughlin (D. C.) 20 F. (2d) 959.

Defendant company has been buying up its own stock for a period of over 19 years. That is good evidence that there is no need to add to the capital structure. The rights of all interested parties must be considered. Were the relief asked for granted, the surplus so transferred would have to be treated as a liability not available for distribution at any time. Peters v. U. S. Mortgage Co. 13 Del. Ch. 11, 114 A. 598; Cannon v. Wiscassett Mills Co. 195 N. C.

119, 41 S. E. 344. There is no hint in the instrument creating the trust that the settlor ever intended that the daughters were to receive from the company any outright interest in the company by virtue of the trust itself, but there was a strong indication that they were to receive from the company only the "entire income" therefrom although the son was to receive his share outright. To now compel the payment of a stock dividend might frustrate this evident purpose of the settlor.

It does not follow, however, from what has just been said that Charles Silverson intended that it would be possible to defeat the right of his daughters to receive the benefits of the trust. By its terms they were to receive the "entire income" therefrom. It is obvious that the less dividends paid out of continued earnings the greater the value of the trust estate. In Goodwin v. McGaughey, 108 Minn. 248, 122 N. W. 6, 9, the settlor directed that the proceeds from the sale of real estate owned by him be invested in other property in such a way as to produce an "annual income," the "interest" thereof to be paid to a beneficiary during her lifetime. Such proceeds were invested in bank stock upon which a stock dividend was declared. This court held that the word "interest" as there used was equivalent to "income" and that the stock dividend was to go to the life beneficiary. In so doing the so-called Pennsylvania or American rule whereby the holder of a life estate of shares of stock is entitled to the earnings accumulated after the life estate arises was expressly followed. Under the Massachusetts rule the life estate receives only that which is actually paid out as cash dividends. See Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. ed. 525; Green v. Bissell, 79 Conn. 547, 64 A. 1056, 8 L.R.A.(N.S.) 1011, 118 A. S. R. 156, 9 Ann. Cas. 99; Minot v. Paine, 99 Mass. 101, 96 Am. D. 705. Annotations dealing with this matter may be found in 24 A. L. R. 9; 42 *id.* 448; 56 *id.* 1287; 72 *id.* 981; 83 *id.* 1261; 101 *id.* 1379, and in numerous law review articles.

Under the rule adopted in the Goodwin case, 108 Minn. 248, 122 N. W. 6, the value of the plaintiffs' inheritance cannot be injured regardless of how long the earnings are permitted to accumulate. Because of the corporate entity and the fiction that the corpora-

tion owns all its assets until distributed, they may have no present right to utilize those earnings, but that does not affect their ultimate right, or that of their heirs, to such earnings in a proper case such as liquidation of the corporation or on settlement of the trust estate. In the Goodwin case the trust was created after the death of a Mrs. Wakefield, and in adopting the Pennsylvania rule it was specifically pointed out that the reason therefor was because the "surplus was all earned after the death of Mrs. Wakefield." Thus here the remainderman cannot be chargeable with bad faith for allowing earnings made since the trust was created to accumulate, for he is entitled only to the original corpus of the trust *res* plus any capital increase in its value. Such undoubtedly must have been the intent of Charles Silverson, for in the trust instrument it is stated that the life beneficiaries were to receive the "entire income." The trust was not created until after the decision of the Goodwin case, wherein it was held that "income" represented by a surplus after the death of the settlor belonged to the life beneficiaries.

Peterson's Estate, 242 Pa. 330, 333, 89 A. 126, 127, was a similar case. There the same problem arose. As to earnings allowed to remain with the company, the court stated: "These earnings were income pure and simple; the fact that they were allowed to accumulate instead of being regularly distributed did not change their character in this regard." Of course there is no way by which those earnings can be obtained from the company until distribution is had thereof, for until that time the corporation is the legal owner of all its assets, including surplus, reserves, and undivided profits. See Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. ed. 525; Gist v. Craig, 142 S. C. 407, 141 S. E. 26; Buist's Estate, 297 Pa. 537, 147 A. 606; Koehler v. Koehler, 99 N. J. Eq. 141, 132 A. 751. The terms of an instrument creating a trust may be the determining factor in a case such as this. See Gist v. Craig, 142 S. C. 407, 141 S. E. 26. Thus in Wallace v. Wallace, 90 S. C. 61, 63, 72 S. E. 553, 554, the trust instrument directed the trustees to whom stock was bequeathed in trust "to pay over to my said daughters, respectively, during their respective lives, the annual income, interest or profits of their respective shares." It was held that surplus and

undivided profits of the corporation arising after the creation of the trust belonged to the life beneficiaries under the terms of the instrument. And so in Cobb v. Fant, 36 S. C. 1, 14 S. E. 959, a similar result was reached. Like considerations would control in the instant case where the life beneficiaries were to receive the "entire income."

The increment in value of this stock, if any there has been, and that is a question that need not be determined at this time, due entirely to earnings accumulated since the creation of the trust, is income on the property that the certificates of stock represent and undoubtedly belongs to the plaintiffs. That does not mean, however, that they can compel the directors, under the circumstances here disclosed, acting in good faith, to declare a dividend, but neither are they foreclosed from asserting any rights to which they may be entitled. There is no intention by this decision to deprive plaintiffs of any proper relief they may seek. That they are not entitled to the particular relief now sought appears clear.

The corporation is paying Charles Taney Silverson a salary of $6,000 a year. Complaint is made of this, it being argued that he is worth no more than $3,000. Although a comparatively young man, he is a large stockholder, well-educated, and vice president of the company. His worth is not necessarily measured by his age or experience. There is no evidence upon which a finding that the salary is excessive or that it was fixed as the result of arbitrary action on part of the directors could be justified. As said in Seitz v. Union B. & M. Mfg. Co. 152 Minn. 460, 464, 189 N. W. 586, 587, 27 A. L. R. 293:

"An intolerable condition might result if the courts should too lightly undertake the fixing of salaries at the suit of dissatisfied stockholders. * * * The dissenting stockholder should come into court with proof of wrongdoing or oppression and should have more than a claim based on mere differences of opinion upon the question whether equal services could have been procured for somewhat less."

A new trial is demanded for claimed errors of law occurring at the trial. Evidence of conversations had prior to the date of the trial was excluded on the ground that the litigation had commenced and the conversations related to negotiations had for the settlement thereof. It is well settled that such evidence may be excluded, for the law favors compromise. Bartels v. Schwake, 153 Minn. 251, 190 N. W. 178; see Quirk v. Consumers Power Co. 127 Minn. 526, 149 N. W. 193. Although the trial had not commenced at the time the conversations took place, it does seem that their purpose was to bring about an amicable settlement of this dispute without resort to a trial, thus making the above stated rule applicable in this instance. There are numerous other assignments of error relating to grounds for a new trial. They have been carefully considered but do not warrant one. The printed record is extremely lengthy, comprising almost 2,500 pages even after the transcript had been greatly deleted. The actual trial consumed a great deal of time. It is to be expected that there would be some immaterial errors in a trial of this nature. In any event, there were none that would have influenced the result in any manner.

The decision of the trial court denying plaintiffs relief in this action is affirmed.

Affirmed.

MR. CHIEF JUSTICE GALLAGHER, not having been a member of the court when this case was argued and submitted, took no part in its consideration or decision.

MR. JUSTICE STONE took no part in the consideration or decision of this case.