The Farmers Elevator Co. of East Grand Forks, Minnesota v. Commissioner.
Farmers Elevator Co. v. Commissioner
Docket No. 85149.
United States Tax Court
T.C. Memo 1962-204; 1962 Tax Ct. Memo LEXIS 105; 21 T.C.M. (CCH) 1103; T.C.M. (RIA) 62204; August 27, 1962
Fuller Holloway, Esq., and B. H. Saunders, Esq., 1000 Shoreham Bldg., Washington, *106 D.C., for the petitioner. Donald W. Geerhart, Esq., and Willard J. Kiser, Jr., Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the years and in the amounts as follows: Fiscal Year ended
May 31
Amount
1954
$28,840.90
1955
39,234.28
1956
17,426.58
1957
11,923.51
1958
4,994.53
The issue for decision is whether refunds made by petitioner to its patrons on a patronage basis were paid pursuant to an antecedent legal obligation so as to be excludable from petitioner's gross income. Findings of Fact Some of the facts have been stipulated and are found accordingly. The Farmers Elevator Co. of East Grand Forks, Minnesota (hereinafter referred to as petitioner), is a corporation, organized in 1911 under the general laws of the State of Minnesota. Its business is primarily the buying, storing, and selling of grain. Its principal office is, and was at all times material hereto, in the city of East Grand Forks, Minnesota. Petitioner's Federal income tax returns for the taxable years ended May 31, 1954, through 1958 were filed with the district *107 director of internal revenue at St. Paul, Minnesota. Petitioner's original articles of incorporation provided, inter alia, that no person would be entitled to hold more than 15 shares of stock at any one time and that no shareholder could transfer his stock without the approval of the board of directors. It was further provided therein that the duties of the corporate officers as well as the time and method of their election would be prescribed in the bylaws of the corporation. These provisions were in effect during the years here in issue. At a special meeting of petitioner's shareholders held on April 15, 1944, it was unanimously determined that petitioner's bylaws should be changed to comply with the Capper Volstead Act [1] so that petitioner would be exempt from the antitrust laws. On May 13, 1944, petitioner's articles of incorporation were amended to provide that no stockholder would be entitled to more than one vote regardless of stock ownership. On that same date, May 13, 1944, at a special meeting of petitioner's stockholders, a proposed new set of bylaws was read to the *108 meeting and was discussed section by section and as a whole. The proposed new bylaws were adopted as submitted and have since been continuously in effect through May 31, 1958, without pertinent change. The bylaws adopted in 1944 contained, inter alia, the following provisions: ARTICLE III. MEMBERSHIP Section 1. QUALIFICATIONS. Any person, firm, partnership, corporation or association, including both landlords and tenants in share tenancies, who may be the producer of any of the farm products handled by the corporation in any territory tributary to the shipping points of this corporation, may become a member of this corporation upon application accepted by the Board of Directors, by agreeing to comply with the requirements of these By-Laws, and by purchasing at least one share of the capital stock, and by meeting any other requirements at the Board of Directors. Section 2. TERMINATION OF MEMBERSHIP. In case of the death of a member, or if a member ceases to be eligible as prescribed in Section 1, or removes from the territory tributary to the shipping points of the corporation, or ceases to patronize it for a period of three (3) consecutive years, or shall fail to comply with *109 these By-Laws and other requirements, the corporation, through its Board of Directors, may elect to purchase his share or shares and terminate his membership, upon tender to him, or his heirs or legal representatives, of the book value of his share, together with any dividends or patronage refunds due and unpaid, less any indebtedness then due the corporation. * * *
ARTICLE IV. MEETINGS * * *
Section 2. ANNUAL STOCKHOLDERS' MEETINGS. The annual meeting of the stockholders of this corporation shall be held at the place designated by the Board of Directors in the city of East Grand Forks, Minnesota, on the third Saturday in July, at the hour designated by the Board of Directors, but if on a holiday (legal), on the next business day following said meeting to continue from day to day until the business to be transacted shall be finished. Section 3. SPECIAL MEETINGS OF STOCKHOLDERS. Special meetings of the stockholders of the corporation may be called at any time by the President and Secretary, or on petition, in writing, signed by at least twenty (20) stockholders. * * *
ARTICLE VI. DUTIES OF DIRECTORS * * *
Section 4. AUDITS. At least once each year the Board *110 of Directors shall secure the services of a competent and disinterested pubic auditor or accountant who shall make a careful audit of the books and accounts of the corporation and render a report thereon in writing, which shall be submitted to the members of the corporation at their annual meeting. This report shall include at least; (1) A balance sheet showing the true assets and liabilities of the corporation; (2) An operating statement for the fiscal period under review which shall show the cost of and income from sales, and the gross income or loss from each of the commodities handled during the period; (3) An itemized statement of all expenses for the period under review; (4) A statement of the market position of the elevator at the close of the period; (5) A statement of the outstanding storage receipts at the close of the period; (6) A statement of weights and quantities of commodities received and accounted for, showing overages or shortages in each commodity handled; and (7) A certified statement of inventories to be obtained in the manner and form prescribed in the following section. * * *
ARTICLE IX. DISTRIBUTION OF INCOME Section 1. METHOD OF DISTRIBUTION. At the *111 end of the fiscal year, after paying the expenses of the corporation for operation and otherwise, and after setting aside such reserves for depreciation of building, machinery, equipment and office fixtures as may be permitted by law and by the rules, regulations and permissive practice of the pertinent taxing authorities, and after providing for payments on interest or principal of long-time obligations of the corporation or on amortized debts of the corporation incurred in the conduct of its business, and after having provided for the purchase of necessary supplies or equipment, the Board of Directors shall apportion the net income, insofar as funds are available, in the following order and manner: 1. By paying dividends upon the paid up capital stock which shall not exceed six (6) per cent per annum. 2. By setting aside such reserve for permanent surplus as the Board deems advisable and as permitted by law and by the rules, regulations and permissive practice of the pertinent taxing authorities. 3. The balance of such net income may be apportioned between all patrons of the corporation as provided in the following section. Section 2. METHOD OF PAYING PATRONAGE REFUNDS. Patronage *112 refunds shall be paid in cash to all patrons of the corporation, except that in the case of a patron who is eligible for membership in the corporation and who is not the owner of at least two (2) shares of the capital stock of the corporation, patronage refunds shall be credited to the account of such patron until the account shall equal the book value of two (2) shares of stock. The corporation shall issue and deliver to such patron a share of stock when his said patronage refunds, or credits thereto, shall equal the book value of one (1) share of stock, and a second share when said patronage refunds, or credits thereto, shall equal the book value of the second share of stock. If after the payment of operating expenses and dividends on capital stock, and the setting aside of reserves for necessary purposes, it is found possible to declare a patronage refund but the financial condition of the corporation does not permit immediate payment being made either in whole or in part, payment of any or all of such patronage refunds shall be deferred by the Board of Directors until sufficient funds have been accumulated to permit payment in cash. The corporation shall keep and maintain records *113 showing the interests of said patronage refund holders in the assets of the corporation. 1. Grain rate: The total net income from grain operations, after deducting an equitable proportion of all expenses and an equitable proportion of appropriations provided for in Section 1 above, shall be divided among the grain patrons of the corporation upon the basis of the dollar value of sales of each kind of grain by each patron, or in such other equitable manner as may be determined upon by the Board of Directors. 2. Merchandise rate: The total net income accruing from the handling of merchandise and supplies and from other miscellaneous sources, after deducting an equitable proportion of all expenses and an equitable proportion of appropriations provided for in Section 1 above, shall be divided upon the basis of the dollar value of sales to each patron, or in such other equitable manner as may be determined upon by the Board of Directors. * * *
ARTICLE X. MISCELLANEOUS PROVISIONS * * *
Section 4. BUSINESS WITH NONMEMBERS. This corporation is operated for the mutual benefit of its members and patrons, and shall not deal in the products of non-members to an amount greater *114 in value than such as are handled by it for members. During the years 1954 through 1958 petitioner had between 900 and 1,000 stockholders. Approximately 800 of these same stockholders had held stock in petitioner since May 13, 1944, when the new bylaws were adopted. Since their adoption on May 13, 1944, copies of the bylaws have been kept in petitioner's offices and made freely available to any patrons who wanted to read them. Also, they were made available frequently at petitioner's annual stockholder meetings. All of petitioner's patrons upon delivering their grain to petitioner's elevator expected to receive patronage dividends, should petitioner's operation for the year result in a profit. However, they understood that the board of directors had authority to retain what was needed for the reasonable needs of the business. The officers and board of directors of petitioners also understood that petitioner was obligated to return dividends, if and when earned, to the patrons on a patronage basis. They further understood that the board of directors had discretion in setting aside amounts for the reasonable needs of the business. During the fiscal years ended May 31, 1945, through *115 1958, the patronage income derived by petitioner from its grain operations (after applicable allocation of income for payment of dividends on capital stock) and available for refund to grain patrons, and the amounts actually distributed to grain patrons (shortly after the close of the fiscal year) on the basis of their patronage were as follows: Refunds made to
Patronage income
grain patrons
Taxable year
from grain op-
on basis of
ended May 31
erations
patronage
1945
$46,716.15
$44,202.63
1946
8,731.93
0
1947
63,105.94
51,536.87
1948
97,461.04
89,010.05
1949
99,856.60
89,337.76
1950
72,478.74
64,181.07
1951
68,838.40
62,747.85
1952
69,064.23
63,382.67
1953
49,294.89
49,466.70
1954
56,960.70
59,052.10
1955
76,167.46
73,914.85
1956
36,206.24
36,396.14
1957
27,663.07
27,276.54
1958
19,758.42
21,446.74
In each year that a patronage dividend was paid the amount of the dividend was deducted from gross income in reaching taxable income. Petitioner's income tax returns for the years 1945 to 1958 show taxable income, and balance sheets attached to the tax returns show total assets and earned surplus, all as follows: *116 Taxable
Total
Earned
Year
income
assets
surplus
1945
$13,246.33
$156,285.12
$ 23,938.83
1946
13,047.47
107,938.59
49,307.53
1947
21,332.15
206,661.27
63,874.44
1948
24,339.35
359,073.70
80,074.36
1949
24,304.29
383,518.44
96,081.81
1950
21,549.20
354,805.90
110,520.71
1951
21,324.67
364,538.36
124,101.31
1952
20,736.78
467,326.19
135,755.37
1953
12,851.19
434,750.13
141,922.20
1954
16,517.30
497,149.95
150,592.17
1955
16,811.65
469,068.17
159,613.82
1956
15,152.36
382,041.56
167,370.47
1957
15,381.96
418,332.70
175,363.39
1958
8,828.32
413,956.99
178,757.71
Petitioner's capital stock was carried on the above-mentioned balance sheets in amounts varying from $18,550 to $47,500. The tax returns for the years in issue show total depreciable assets, amount deducted as depreciation during year, and reserve for depreciation at year end as follows: Reserve
for de-
Depreciable
Depreci-
preci-
Year
assets
ation
ation
1954
$231,756.00
$ 9,182.29
$45,712.24
1955
233,654.80
9,453.81
53,911.85
1956
237,444.10
9,515.31
62,787.81
1957
235,446.44
10,082.78
69,804.90
1958
238,215.32
10,402.53
80,207.43
*117 In the years in which refunds were made to patrons by petitioner, the procedure for effecting such refunds was to take a yearend inventory and determine the net profits for the year, ascertain the amount and type of grain sold to petitioner by its patrons, and supply all of this information to the board of directors who, at a meeting called for that purpose, would divide the net profits. At the above-mentioned meetings the directors customarily discussed and determined the portion of the profits which would be retained as surplus. They were guided by no fixed formula in making that determination. No amount from grain income was, in fact, set aside for surplus during the years in issue. The directors then declared a 6 percent dividend on capital stock. They also determined whether bonuses should be paid to employees and, if so, the amounts. Thereupon the directors would authorize the payment of the remainder of the year's net profits to patrons on the basis of the extent of their patronage during that year. In the fall of 1945, petitioner's elevator and the grain in it were completely destroyed by fire. At a special meeting of the members held on September 12, 1945, rebuilding *118 of petitioner's elevator was considered and patrons were advised that there probably would not be patronage dividends if the elevator were rebuilt. Such matters were discussed for some time, and thereupon it was voted unanimously to rebuild the elevator, with a $100,000 limit on the amount that could be spent for rebuilding. Petitioner received approximately $40,000 from fire insurance on the elevator and the approximate cost of rebuilding the elevator was $85,000. Petitioner retained all income from its reduced grain operations for the year 1946 and a part of such income for the years 1947 through 1952 to pay for the cost of rebuilding its plant. At some time in or prior to 1948 Albert Tabert, petitioner's business manager, was instructed orally by petitioner's directors and officers to promise its grain patrons who delivered their grain to petitioner and prospective patrons, that they would be paid refunds based on patronage if there were patronage income from grain. In accordance with the directions given him by the directors and officers, Tabert did, on various occasions, personally solicit grain from approximately 90 percent of petitioner's patrons with the promise that petitioner *119 would refund its income from grain operations on the basis of patronage. Tabert did not promise any patron that he would receive any stated definite amount or that the patrons as a whole would receive a stated definite proportion of net income earned by petitioner. Petitioner financed much of its grain operations with funds borrowed from a commission company. Petitioner had a seasonal need for such funds with the peak need occurring during the 6-week to 2-month period from July until September. Petitioner borrowed sums for 2 to 3-month terms at a rate of 4 percent per annum. During the years in issue petitioner had an average interest expense of approximately $2,500 per year. At all times material hereto there were at least two other grain elevators in the immediate vicinity of East Grand Forks. Neither of these other elevators paid dividends to its customers based on patronage. These other elevators on occasion offered a slightly higher price per bushel of grain than did petitioner. On other occasions the reverse was true, petitioner's offering price being slightly higher. Occasionally petitioner's customers preferred to sell to petitioner despite higher prices offered by petitioner's *120 competitors, on the basis of their expectation that they would receive a dividend based on patronage equal to or greater than the initial price differential. On other occasions the same customers would sell to petitioner's competitors if the latter's prices were sufficiently higher than petitioner's. For the 5 years in issue respondent determined that the amount deducted by petitioner in each year as a patronage dividend did not constitute an exclusion of or deduction from gross income in determining taxable net income. Opinion The issue in this case is whether patronage refunds made by petitioner (a farmers cooperative not exempt from tax under the provisions of section 501(c) of the Internal Revenue Code of 1954) to its customers on a patronage basis were made pursuant to a preexisting legal obligation. [2] It has been held in numerous cases that there may be excluded from gross income true patronage refunds or dividends of cooperatives allocated or paid to patrons where the cooperative is committed to return such amounts prior to the transactions with such patrons which gave rise to such refunds or dividends. Fruit Growers Supply Co., 21 B.T.A. 315 (1930), *121 affd. 56 F. 2d 90 (C.A. 9, 1932); Midland Cooperative Wholesale, 44 B.T.A. 824 (1941); United Cooperatives, Inc., 4 T.C. 93 (1944); Producers Crop Improvement Association, 7 T.C. 562 (1946); Colony Farms Cooperative Dairy, Inc., 17 T.C. 688 (1951); and Farmers Cooperative Co. v. Birmingham, 86 F. Supp. 201 (N.D. Iowa, 1949).
The exclusion of patronage dividends from taxable income of a cooperative has been upon the theory that they constitute corrective and deferred price adjustments, which serve to reduce the amount of the cooperative's gross profits from sales, and actually never become part of the cooperative's gross income. Under this theory there must be a legal obligation on the cooperative to make the price adjustment at the time of the transaction with the patron, for if any subsequent corporate act is required before the cooperative becomes legally liable to pay the patronage dividend, the cooperative *122 has asserted control over the income and, therefore, should be taxed thereon. Farmers Cooperative Co. v. Birmingham, supra, at pages 213 and 227. Petitioner argues that its bylaws required the distribution to its patrons on a patronage basis of all its net profits remaining after the setting aside of reserves for necessary purposes and payment of dividends on the capital stock not exceeding 6 percent, and that its patrons all dealt with it upon that understanding. Respondent contends first that the bylaw provisions respecting the distribution of net income to the patrons are permissive, not mandatory. Respondent argues in the alternative that even if the bylaws are construed as requiring payment of dividends, the discretion granted to the board of directors to allocate unlimited amounts of net income to permanent surplus negates the existence of any possible preexisting legal obligation to distribute the income to the patrons. Respondent further argues that there were no representations made to petitioner's patrons respecting the payment of patronage dividends inconsistent with the broad discretion reposed in the board of directors to allocate amounts to permanent *123 surplus. The provisions of petitioner's bylaws, read as a whole, sustain petitioner's contention that they require the distribution as patronage dividends of its net income after payment of dividends not to exceed 6 percent on capital stock and the setting aside of reserves for necessary purposes to meet the reasonable needs of its business. [3] We agree with petitioner that the provision of section 2 of article IX of its bylaws referring to the method of paying patronage dividends makes it clear that section 1 of article IX providing for the method of distribution of income is mandatory in its requirement of payment of patronage dividends. [4] Not only do we agree with petitioner that its bylaws require the payment of such patronage dividends, but we further agree with petitioner that the evidence establishes that in most instances an oral contract to pay such patronage dividends if the corporation had net income from its grain operations was made by petitioner with the various patrons at the time of the purchase of their grain. *124 There have been a number of cases involving the exclusion of patronage dividends from the income of cooperatives with articles of incorporation, bylaws, or agreements with patrons which reposed in the board of directors discretion to allocate income to various reserves before any amount was to be paid to patrons as patronage dividends. Clover Farm Stores Corporation, 17 T.C. 1265 (1952), (the exclusion was allowed where taxpayer's bylaws provided in substance that the excess of gross revenues for the year over its expenses, losses, reserves, and certain other charges be paid as patronage dividends)., Dr. P. Phillips Cooperative, 17 T.C. 1002 (1950) (the exclusion was allowed where income was to be distributed but the taxpayer could establish and maintain reasonable and necessary reserves); Colony Farms Cooperative Dairy, Inc., supra, (the exclusion was allowed where the taxpayer's contract with members provided for its retaining from sales proceeds amounts necessary to meet operating and maintenance expenses or to provide reserves for any proper purpose); Producers Crop Improvement Association, supra, (the exclusion was allowed *125 where provision was that earnings were to be distributed to vendees after setting aside reserves, surplus, and working capital); Midland Cooperative Wholesale, supra (exclusion of patronage dividends was allowed to a Minnesota cooperative where its bylaws included among the deductions from receipts to determine amounts distributable to patrons "at least ten percent (10%) of the annual income" as a permanent surplus until such reserves shall equal the paid-up capital). However, in none of these cases was the issue raised whether the discretion in the board of directors to allocate income to the various reserves prior to distribution of patronage dividends negated the existence of a preexisting legal obligation to pay such patronage dividends. In several cases the Government had allowed deduction of amounts actually distributed as patronage dividends notwithstanding the fact that the boards of directors in those cases had broad discretion to allocate net income to reserves. Respondent recognizes that in a number of decided cases involving provisions for reserves under State law governing cooperatives, corporate charters, bylaws, or contractual agreements with patrons indistinguishable *126 from the provision of petitioner's bylaws as to reserves for surplus, he has not challenged the exclusion of the patronage dividends because of such provisions. He nevertheless, contends that these cases do not control the instant case, since in the instant case he does contend that if petitioner's bylaws or oral agreements with its patrons are interpreted as requiring the payment of patronage dividends, the amount, if any, which would be paid was so indefinite because of the provision in petitioner's bylaws for reserves for permanent surplus as in effect to negate the existence of any preexisting legal obligation to pay such dividends. Respondent argues that if the provisions of the bylaws permitting the directors to set aside such reserves for permanent surplus as they deem advisable prior to the apportionment of the balance of the net income as patronage dividends [5] is limited to reserves for the reasonable needs of petitioner's business or necessary purposes thereof, the evidence fails to show that petitioner's surplus during the years here involved met these tests. *127 The evidence shows that petitioner's earned surplus in 1954 was $150,592.17 and for each of the other years here involved was higher than in 1954. The maximum amount at which petitioner's capital stock was carried on its books during these years was $47,500. It is, therefore, apparent that petitioner's surplus during all the years here involved was many times the permanent surplus of 50 percent of paid-up capital required by section 308.12, M.S.A. The directors at their meetings discussed the retention of profits as surplus and one of the directors who testified at the trial stated that in his opinion the retained surplus during the years here involved was reasonable for the necessary purposes of petitioner's business. Respondent contends that petitioner could have reasonably accumulated all the earnings and profits during the years in issue in its reserve for permanent surplus. Respondent argues that the policy of distributing all or most of its earnings from grain operations has left the petitioner in a short cash position. Respondent asserts that petitioner's lack of adequate working capital is shown by the fact that petitioner has had to expend amounts ranging up to $4,323.11 *128 for interest on borrowed money during the years in issue. Respondent also points to testimony by one of petitioner's officers that petitioner could have put its earnings to good use had they been retained. With respect to petitioner's need for financing, it appears that such need is seasonal, being at a peak for a 2-month period from July until September. For the years in issue petitioner has had an average annual interest expense of approximately $2,500. However, because petitioner's demand for credit was seasonal, its requirements for credit at its peaktime would be considerably in excess of the approximately $60,000 to $100,000 yearly average borrowings indicated by its yearly interest payments. It would not have been prudent, as petitioner points out, for petitioner to have accumulated funds sufficient to meet its short-term cash requirements. Respondent argues that petitioner in the discretion of its directors might have retained its earnings to build new elevators and thus expand its business. Petitioner argues that such action by the directors in any year would not have been a reasonable surplus provision and would not have been a permissible action of the board of directors *129 without consent of its stockholder patrons. Petitioner points to the fact that when its elevator burned during its fiscal year 1946, the problem of rebuilding and financing such rebuilding was taken up at its annual stockholders' meeting and the rebuilding was done in accordance with the action taken by the stockholders. Petitioner's bylaws specifically require that an audit statement be presented at its stockholders' meeting. [6] The action taken by petitioner's directors when its elevator burned, as well as the provision of petitioner's bylaws requiring the submission of a detailed audit report to its stockholders at its annual meeting, tends to support petitioner's position that it would be unreasonable for its directors to allocate reserves for substantial expansion of its business through capital improvement without consent of its stockholder patrons. In any event, the evidence shows that no such expansion program was contemplated by petitioner for the years here in issue and therefore during those years allocations to surplus for such a program were unnecessary. We consider petitioner's accumulated surplus to be reasonable for the needs of its business during each of the years *130 here involved. Respondent relies in support of his contention primarily on United Cooperatives, Inc., 4 T.C. 93 (1944). In that case the corporate bylaws empowered the board of directors to pay dividends on the capital stock not to exceed 8 percent of the par value thereof, to set aside a reserve for depreciation in an amount to be determined by the directors but not less than 5 percent, and to remit the remaining net income to the patrons *131 as a patronage dividend. During the taxable year there involved no dividends were declared on the stock and practically all the net income was repaid to the patrons in dividends. Exclusion of patronage dividends to an amount equal to 8 percent of the par value of the capital stock was denied since the directors had full discretion to divert income to this extent away from patrons and pay it as dividends to stockholders, thus negating any legal obligation to pay patronage dividends to the extent of such amount. In the instant case, had the directors not declared the 6 percent dividend on capital stock, a situation comparable to that existing in United Cooperatives, Inc., supra, would be here present. However, here the 6 percent dividend on capital stock was declared each year and the amounts of petitioner's surplus during these years were reasonable so that there existed no uncontrolled discretion in the directors such as existed as to the 8 percent dividend payment in United Cooperatives, Inc., supra. We sustain petitioner in its contention that the patronage dividends paid by it in each of the years here involved are excludable in computing its taxable *132 income except to the extent that petitioner has conceded that the amounts excluded by it were excessive. Decision will be entered under Rule 50. Footnotes
1. 7 U.S.C.A., ch. 12 - Associations of Agricultural Products Producers.↩
2. Both parties recognize that although petitioner was incorporated under the general laws of Minnesota, it has been a farmers' cooperative since 1944 but is not exempt from Federal income tax.↩
3. That the reserve for permanent surplus provided for in section 1 of article IX of petitioner's bylaws contemplated reserves for necessary purposes to meet the reasonable needs of its business is shown not only by the reference in section 2 of that article to reserves for necessary purposes, but also by the additional limitations that these reserves be such as are permitted by the rules, regulations, and permissive practice of the pertinent taxing authorities. At the time of adoption of these bylaws in 1944, sec. 102, I.R.C. 1939, then in effect, provided: (a) Imposition of Tax. - There shall be levied, collected and paid for each taxable year (in addition to other tax imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium or permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. ↩
4. It might be noted here that this interpretation is in accordance with the Minnesota statutes governing cooperative associations. Sec. 308.06, M.S.A., provides in this respect: * * * The articles of incorporation of any association organized under or subject to the provisions hereof shall always contain provisions specifying * * * (9) that net income in excess of dividends and additions to reserves and surplus shall be distributed on the basis of patronage, and that the records of the association may show the interest of patrons, stockholders and members in the reserves and surplus. In Minnesota the discretion reposed in the board of directors of a business corporation to accumulate earnings as opposed to declaring dividends, although broad, is subject to judicial review. Keough v. St. Paul Milk Co., 205 Minn. 96 (1939), 285 N.W. 809, and Schmitt v. Eagle Roller Mill Co., 199 Minn. 382 (1937), 272 N.W. 277. The discretion of the directors of a cooperative in disposing of its earnings is subject to greater restraints than those imposed upon the directors of an ordinary business. Farmers Cooperative Co. v. Birmingham, 86 F. Supp. 201↩ (N.D. Iowa, 1949).
5. Here again this provision is in accordance with the Minnesota Statutes governing cooperatives except that petitioner's bylaws add to the limitation of the reserves for permanent surplus which may be set aside that they be permitted by the rules, regulations, and permissive practice of the pertinent taxing authorities. Sec. 308.12, M.S.A., provides in part: An association organized under sections 308.05 to 308.18 may set aside such part of its net income during its first two fiscal years as its board of directors deems advisable, for the purpose of creating a reserve for permanent surplus, and annually thereafter its board of directors shall set aside for the purpose of such reserve at least ten per cent of the annual net income until the reserve for permanent surplus shall equal 50 per cent of the paid-up capital, and thereafter the reserve for permanent surplus may be increased from time to time by the board of directors of the association to such an amount as it deems advisable. * * * Net income in excess of dividends on capital stock and additions to reserve and surplus shall be distributed on the basis of patronage. * * * Distribution of net income shall be made annually or oftener.↩
6. The submission of a yearly financial report to the stockholders is also required by Minnesota statutes. Sec. 308.09, M.S.A., provides in part: Regular meetings of the stockholders of cooperative associations organized under sections 308.05 to 308.18 shall be held annually, at the principal place of business of the association, at such times as shall be designated in the bylaws. At such annual meeting reports covering the business of the association for the previous fiscal year and showing the condition of the association at the close of the fiscal year shall be submitted to the stockholders by the officers, and directors shall be elected for such terms of office as shall be prescribed in the bylaws of the association. * * *↩