## P. J. KEOUGH v. ST. PAUL MILK COMPANY.
## JAMES D. KEOUGH AND ANOTHER v. ST. PAUL MILK COMPANY AND OTHERS.[1]

Nos. 31,832, 31,833, 31,834, 31,847.

April 14, 1939.

[1]Reported in 285 N. W. 809.

98

100

Oscar Hallam and Ben W. Palmer, for defendant-appellants.

R. Edison Barr, Dohs & Barr, and Wilfrid E. Rumble, for respondents and appellant Patrick J. Keough.

Loring, Justice.

These three appeals by defendants are from orders denying their motions for new trial after decisions made against them as a result of trial by the court without a jury. Amended findings were asked for and denied. The court having found against Patrick J. Keough upon one issue in the case where he alone was plaintiff, he has appealed from a like order denying a like motion.

These appeals involve the determination of a variety of asserted causes of action, brought and pleaded in the form of three separate suits, but consolidated for trial below and treated there and here very much as if a single suit had been instituted because of the interrelation of facts and issues in each action.

The suit in which Patrick J. Keough alone is plaintiff and the corporation alone is defendant was one brought to recover as an officer and employe on his salary account. He prevailed as to all but one item, and this suit will hereinafter be referred to as the "salary suit." It is in this suit that plaintiff is also appellant. In the other cases James D. Keough, Patrick's brother, joined him as plaintiff, as trustee of Patrick's corporate stock under a trust agreement. In one of these cases, plaintiffs, on the ground of fraud, sought recovery of 13½ shares of the corporate stock and the dividends which had accrued thereon since their original issue. This case will be referred to as the "stock division suit." In the third

case, brought by James as trustee and by Patrick individually, on behalf of themselves and the corporation and all stockholders therein, plaintiffs sought to have certain corporate actions annulled as oppressive toward the minority. This will be called the "representative suit."

The issues litigated in the salary suit had their origin in the following facts, which in large measure are relevant to the other suits subsequently to be discussed.

About 50 years ago plaintiff, Patrick Keough, then a young man of 17, conducted a milk route in St. Paul. He was a farmer as well as a dairyman. Because of a fire, he was compelled to give up his business. In 1903 Patrick's sister Mary married a neighbor, Patrick Ryan. Ryan proved to be a successful businessman and was highly regarded as such by the Keoughs. In 1916 Patrick Keough and his brother James reëntered the dairy business as partners with Ryan and Peter A. Hanson. The amount contributed by each is involved in the stock suit, but for present purposes it can be taken as $20,000 by the Keoughs, $15,000 by Ryan, and $5,000 by Hanson in the form of milk routes. The partnership purchased the Casey Pure Milk Company for $56,500, the finances being handled by Ryan. During the period of the partnership James Keough transferred his interest to the present plaintiff.

The business was conducted by the partnership from May, 1916, until March, 1917. At this time the partners incorporated the St. Paul Milk Company, and the partnership assets and liabilities were turned over to it and corporate stock was issued to the partners for their respective interests. The authorized capital was $100,000 with authority to conduct business when $50,000 was paid in. Actually only 597 shares of $100 par value were issued, of which 285 were issued to Patrick Keough, 240 to Ryan, and 72 to Hanson. This division was made by Ryan. Keough and Hanson did not actively participate in it but relied upon Ryan to divide the shares so that their proportionate holdings would be preserved according to their former respective contributions of capital to the partnership. The stock suit assails this division as giving Patrick Keough 13½ shares less than he was entitled to.

Ryan was selected as president of the corporation, Patrick Keough vice president, and Hanson secretary. These three were the sole stockholders and directors.

The corporation proved to be a striking success. From the small beginning in 1917 a large organization free from debt and with a substantial surplus was soon built up. Total annual sales increased from $525,000 in 1918 to $1,250,000 in 1936. That Ryan was the guiding force which produced this remarkable result cannot be disputed. He was a man of unusual executive ability and tremendous energy. It is largely to him that credit for the financial success of the corporation must be given. The evidence clearly establishes that while the business was in form corporate, yet actually it was conducted by Ryan as though it were one in which he was the sole proprietor. Ryan fixed salaries, usually determined when dividends should be paid, bought a subsidiary company, and engaged in other similar activities without consultation or advice from the others save possibly Hanson, who was friendly to Ryan and his form of management. Apparently Hanson seldom, if ever, took issue with him on matters pertaining to business. That Ryan did not underestimate his own value to the corporation is shown by his action in raising his own salary to $22,000 a year. He valued Hanson up to $10,400 a year. Keough's position as director existed only in name and form. It was not a reality. Keough did not and was not asked to participate in corporate affairs. He worked for the corporation in a manual capacity, caring for the company's horses and was in general charge of the stable. His education was limited and his knowledge of business slight. The corporate affairs were conducted in an informal manner, and Keough, though near the office and vice president, was never consulted either by Ryan or Hanson as to his views on any of the matters in which the corporation was concerned. Keough apparently acquiesced in this submergence for the reason that he was content with his work and not acquainted with business or corporate affairs.

Ryan fixed the corporate salaries at the end of the year for which they were payable. The corporation kept an account of milk and other dairy products purchased from it by Patrick Keough, and this

was charged to him in the "merchandise account." Salaries were indefinite until fixed by Ryan, but during the year Keough would draw money and this would be charged against him in the "salary account."

Keough left the employ of the corporation in November, 1930. At this time he sold 185 shares of his stock to the corporation, keeping 100. Ryan died on December 13, 1933, leaving Hanson the only original partner who was a salaried officer of the corporation. Ryan was succeeded by his widow, Mary Ryan, Sr., as president. His three sons, Richard, Harry, and Emmett, soon entered the picture. Friction rapidly developed within the family circle, and James Keough, who holds plaintiff's remaining 100 shares in trust, caused an accountant to examine the corporate records. Certain irregularities were alleged to have been discovered, and these actions were brought.

### Salary Suit.

In the complaint in the salary suit four specific transactions were alleged as fraudulent. Patrick asked for an accounting covering all the transactions between himself and the corporation from March 1, 1917, to November 8, 1930. He alleged that he relied upon the officers to keep a true account and that he did not discover the false entries until 1936. He alleged on information and belief that there were other fraudulent entries and that an accounting was necessary to determine whether such was the case.

■ Defendant contends that the complaint does not state a cause of action for equitable relief. Its assignments of error are insufficient to raise this point, but that the action is one for an accounting is clear. Meyers v. Barrett & Zimmerman, Inc. 196 Minn. 276, 264 N. W. 769. The only question is whether the facts alleged present a situation in which equitable powers can be exerted. Plaintiff has alleged fraud in the keeping of the accounts. Fraud is an ancient source of equity jurisprudence, and an accounting generally will be given where it is charged. 1 C. J. S., Accounting, § 20; Patrons' Mut. F. Ins. Co. v. Holden, 245 Mich. 493, 222 N. W. 754; see Smith v. Blodget, 187 Cal. 235, 242, 201 P. 584, 587; 2 Pomeroy,

Eq. Jur. (4 ed. ) § 910, p. 1891. The complaint adequately charges that the accounts between the parties were mutual. This furnishes additional reason for equitable cognizance.

"The instances in which the legal remedies are held to be inadequate, and therefore a suit in equity for an accounting proper, are: 1. Where there are mutual accounts between the plaintiff and the defendant,—that is, where each of the two parties has received and paid on account of the other." 4 Pomeroy, Eq. Jur. (4 ed.) § 1421, p. 3368. See, also, 1 C. J. S., Accounting, § 18, p. 650.

The complaint is sufficient.

■ The amended complaint in the salary suit shows upon its face that all but one transaction asserted to have been fraudulent occurred prior to six years from the date on which this action was commenced. The statute of limitations has been pleaded. We think the trial court correctly held it was not a barrier. Since the action is for an accounting, it is not governed by 2 Mason Minn. St. 1927, § 9197, but is controlled, since fraud is alleged, by 2 Mason Minn. St. 1927, § 9191(6), which provides that the cause of action is not deemed to have accrued until the discovery of the facts constituting the fraud. Dumbadee v. Lignante, 244 N. Y. 1, 154 N. E. 645; Lundquist v. Peterson, 134 Minn. 279, 158 N. W. 426, 159 N. W. 569. Plaintiff has alleged and has introduced evidence tending to prove, as he must (Morrill v. Little Falls Mfg. Co. 53 Minn. 371, 55 N. W. 547, 21 L. R. A. 174), that he did not discover the fraud until within six years. The question is whether he should have discovered the fraud at an earlier time. Whether his failure is justifiable can only be determined in the light of the circumstances surrounding the transactions and the relationship of the parties during the relevant time. From 1917 to 1930, Ryan and Hanson, aside from the plaintiff, were the sole stockholders. They were the corporation insofar as corporate activities were indulged in. While defendant was a corporation, yet actually its affairs were conducted by Ryan as if the business were his own. There is evidence tending to show that the corporate records reflect Ryan's commands obediently per-

formed by subordinates. The financial records between plaintiff and the defendant were kept by the corporation. Patrick kept no books. Ryan was respected and highly regarded by plaintiff. The record shows that Patrick reposed trust and confidence in Ryan, and not without justification or invitation. During the years of association the business was well run, Patrick was well paid, and was not in financial distress. Ryan's management produced excellent dividends, and on the surface there was no reason for Patrick to suspect that he was being duped. The evidence sustains the trial court's finding that a confidential relationship existed and that the delay was reasonably explainable under the circumstances. On all the evidence, we are satisfied that the trial court was justified in finding that failure to discover the fraud sooner was bottomed on reasonable grounds. When a confidential relationship exists, failure to discover fraud is looked upon with more indulgence since generally a false sense of security and trust is present in the mind of the injured party. The statute of limitations is not a bar. Stark v. Equitable L. Assur. Soc. 205 Minn. 138, 285 N. W. 466.

■ Some comment may be made on the defense of laches. Substantially the same facts which sustain the failure to discover the fraud at an earlier date justify the delay in asserting the rights of which the plaintiff was ignorant. In Briggs v. Buzzell, 164 Minn. 116, 119, 204 N. W. 548, 549, this court speaking through Commissioner Lees said:

"The pith of the doctrine of laches is unreasonable delay in enforcing a known right. State v. Brooks-S. Lbr. Co. 122 Minn. 400, 142 N. W. 717. In a general sense it is such negligence in asserting a right as will bar one from obtaining equitable relief. Whether the delay was culpable or not depends on many circumstances, among which are actual or imputable knowledge of the facts, and resulting prejudice from the delay either to the defendant or to those who have equities to be protected. Bausman v. Kelley, 38 Minn. 197, 36 N. W. 333, 8 A. S. R. 661; Lloyd v. Simons, 97 Minn. 315, 105 N. W. 902; 10 R. C. L. p. 405.

"In McQueen v. Burhans, 77 Minn. 382, 80 N. W. 201, it was remarked that the fact that defendant's position had not changed to his detriment did not necessarily defeat the defense of laches; but in Haataja v. Saarenpaa, 118 Minn. 255, 136 N. W. 871, we find this language: 'Delay must be culpable in order to become laches, and prejudice must result.' The latter statement appeals to reason, for, so long as the parties are in the same condition as they were before the delay occurred, it matters little whether the plaintiff presses his right promptly or slowly within the period allowed by law. Not until the situation has changed so that the defendant cannot be restored to his former state, if the right should be enforced, does the delay become inequitable or operate as an estoppel against the assertion of the right.

"Numerous cases approve of this doctrine, among them Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. ed. 738, and Penn. Mutual Life Ins. Co. v. Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. ed. 626."

In Ekberg v. Swedish-Am. Pub. Co. 114 Minn. 196, 200, 130 N. W. 1029, 1031, this court said:

"In determining the question of laches, it is necessary to consider, not only the lapse of time, but the relations of the parties to each other, their conduct throughout, and particularly plaintiff's knowledge or want of knowledge of the actual situation."

Where the relationship is one of confidence and fraud has occurred, the evidence should be very convincing before the defrauded party should be barred. Plaintiff's ignorance of his rights was proved and explained, and this "excuses his delay in suing to enforce the claim, particularly when his claim is based on the fraud." McClintock, Equity, § 26, p. 40. Upon discovery, action was immediately instituted. The application of the doctrine of laches depends largely upon the particular facts and in this case presented a question of fact for the trial court. 4 Dunnell, Minn. Dig. (2 ed.) § 5351, p. 67; Kent v. Costin, 130 Minn. 450, 153 N. W. 874. Conceding that the death of a material witness is a consideration to be reckoned with in determining whether laches should apply, it is

not conclusive. The conclusion of the trial court not to declare laches a bar because of this factor was not error. A finding of laches involves the balancing of prejudice from complainant's delay against the reasons given by the complainant in explanation. "Laches is an equitable defense and ought not to be applied in a way that would do injustice." Osincup v. Henthorn, 89 Kan. 58, 63, 130 P. 652, 654, 46 L.R.A. (N.S.) 174, 179, Ann. Cas. 1914C, 1262.

The contested entries which were claimed to be fraudulent are as follows:

■ A check drawn by the corporation on November 10, 1921, payable to T. J. Doyle for $1,800. Nine hundred dollars of this check was charged to the plaintiff's salary account. The lower court found this charge to be false and fraudulent. It is argued that this finding is not supported by evidence adequate to sustain the burden. Doyle was an attorney who had done legal work for the corporation in the early days of its existence. He testified that he did not recall "anything particular about the check." Nor did he recall receiving it. He did testify that he did not remember ever doing legal work for plaintiff. Likewise, plaintiff denied that he ever had any transactions with Doyle or that he ever owed Doyle anything. The defendant's examination of the witnesses simply presented a basis for speculation. Ryan, through whom the corporation acted, owed an active duty of good faith and honesty toward plaintiff, to whom he was a confident. The issue presented was one of fact. In light of the rules respecting proof of fraud, which need not be discussed here, we think the finding below is substantiated by sufficient evidence to justify the result.

■ On December 22, 1931, the salary account was charged with $2,808.97, for a check, drawn at the command of Ryan, payable to plaintiff, and endorsed by the bookkeeper, under Ryan's orders, with the plaintiff's name followed by the bookkeeper's initials, in favor of the St. Paul Milk Company. The check was deposited to the credit of the milk company and the amount thereof added to the cash sales account. The amount for which the check was drawn represented, according to the corporate books, the balance due Keough for undrawn salary which remained at the time he left

the corporation's employment in 1930. It was found below that the transaction was fraudulent and the charge against the plaintiff false. The transaction, in the absence of explanation, clearly shows fraud. The evidence produced by plaintiff tends to show that there was no legitimate reason for such a transaction. The only explanation offered by defendant is that regularity can be predicated upon the long-standing relationship of the parties and the presumption of honesty and regularity in corporate matters. The trial court could properly regard this as insufficient to overcome the evidence produced. Without more than a fact issue presented, the finding below must be sustained.

█ The lower court allowed plaintiff $994.36 on the theory that he had been underpaid such an amount for services from January 1, 1930, to November 8, 1930. Plaintiff was credited in the salary account with only $2,000 for 1930 instead of $3,500 which he received in 1929. The difference, after charges against him in favor of the corporation were deducted, was $994.36. The finding was made that the salary was decreased fraudulently. Defendant assails this as contrary to the evidence. It is clearly established that Ryan fixed salaries in his discretion for many years, openly and with the acquiescence of the others, who had the power to object. The first board meeting fixed the salaries at $150 per month for each of the officers until such time as further change was made. This schedule was adhered to for a short time, but subsequently raises were made without regard to it. From 1921 until 1928, $3,000 per annum, fixed at the end of the year, was paid plaintiff. There was no written contract of employment. The evidence shows the reduction in 1930 to have been made by an officer who by long conduct, acquiesced in by all concerned, had acquired the power so to act. The only basis for fraud, since the conduct is equally referable to good faith action, is that other false items permeate the entire relationship. In the absence of other facts, we do not think this alone sustains the burden of proof in face of evidence by defendant that tended to show that plaintiff was absent from work at times during the year, was drinking to some extent, and, though this was contradicted, that the work in the barn was decreasing be-

cause of the transition from horse to motor vehicle delivery. We do not think the evidence is sufficient to sustain the finding made below.

■ The last item alleged to be fraudulent was based on a transaction which was entered on the books as of September 4, 1923, when plaintiff's salary account was charged with a check of $1,600. It was disallowed by the trial court and is the subject of plaintiff's appeal. Defendants were unable to produce the check. Plaintiff urges that he never received it and that he was defrauded of the amount. The action being for accounting, the verity of each item is to be determined. The court must, of course, recognize that the accounts represent dealings between the parties covering a long period, and the fact that some entries are false is some evidence that there is a general scheme to defraud broad enough to comprehend the particular entry under consideration. Albrecht v. Rathai, 150 Minn. 256, 185 N. W. 259. However, this is by no means conclusive, for it is obviously possible for the same set of books to contain both true and false items. We cannot say that on the facts there was error in refusing to allow plaintiff this amount. The evidence adduced by plaintiff was not compelling, and the conclusion arrived at by the trial court must be sustained.

■ Error also is predicated upon a ruling in respect to receiving certain evidence. Here again appellant's assignments of error are insufficient. Plaintiff called Peter A. Hanson, secretary of the defendant corporation, as a witness. While he was testifying the minutes of the corporation were produced and were offered and received in evidence. Hanson testified that they were true and correct. Subsequently plaintiff called James D. Keough as a witness and asked various questions for the purpose of proving that the minutes of the March 16, 1936, meeting were not true and correct. Defendant objected on the ground that plaintiff, having introduced the minutes, was bound thereby and could neither impeach them nor his own witness, Hanson. There was no error in receiving this testimony. It is clear that plaintiff was contending that the minutes were inaccurate and incorrect. Obviously, by well established rules, a party is not bound by the evidence of a witness to the ex-

tent that he may not show a different state of facts by other witnesses. This is fundamental. 6 Dunnell, Minn. Dig. (2 ed. & 1937 Supp.) § 10356. We see no difference in principle between oral and documentary evidence in this regard.

■ It is charged that there was a violation of 2 Mason Minn. St. 1927, § 9817, rendering inadmissible from the lips of a party to the action or one interested in the event thereof testimony of or concerning any conversation with a deceased person. Plaintiff was asked: "During this period while you were down there [at the milk plant] and while these dividends were being declared, did Mr. Ryan ever have any conversation with you about dividends?" Over objection the answer "no" was given. The purpose of the question was to prove by Keough that Ryan had never consulted him in respect to dividends. There was technical error in receiving it under the facts presented here for it sought by indirection to prove what was not admissible. Waggoner v. Gummerum, 180 Minn. 391, 231 N. W. 10, deals with the same thing in principle, and we deem it controlling. However, we do not see substantial prejudice which should justify a new trial. Other evidence compelled the conclusion that Keough did not participate in corporate affairs. Moreover, the matter of dividends was foreign to the issues in the salary suit.

### Representative Suit.

We consider next the "representative suit" instituted by James D. Keough as trustee and P. J. Keough, on behalf of themselves and all other stockholders, who as it happens all appear to be defendants. This suit was brought for the purpose of recovering for the wrongful diversion of corporate assets and to compel the declaration of a cash dividend.

■ The first question presented is whether it was error to allow the complaint to be amended at the trial so that the sixth and seventh causes of action could be added for conversion of dairy products by Mrs. Mary Ryan and P. A. Hanson.

The first cause set out in the complaint alleged fraud and conspiracy by the majority of stockholders and directors resulting in

an illegal accumulation of surplus. The second and third causes alleged excessive and unauthorized corporate salaries. The fourth alleged mismanagement of the South St. Paul Dairies, Inc. and asked for its dissolution. The fifth alleged investment in bonds as *ultra vires* and part of a conspiracy to withhold dividends. To these were added by the assailed amendment two counts in conversion. The Ryans and Hanson since the early days of the business have received their dairy products from the St. Paul Milk Company but have never paid, and, it appears, never intended to pay for them. On the other hand, Patrick Keough was charged for all that he used.

The defendants object to the amendment as violating 2 Mason Minn. St. 1927, § 9277. This statute governs the joinder of causes of action in our practice and permits it with respect to two or more causes of action, whether legal or equitable, if they, among other things, affect all parties to the action, and (by § 9277[1]) if they arise out of the same transaction or transactions connected with the subject of the action.

Defendants assert that the amendment injected new issues into the action. It did, but not in such a manner as to violate the statute. The tort actions for conversion did not enlarge the scope of the suit as originally cast by the complaint. This becomes apparent when the second and third causes alleged are examined. No new issues within the prohibition ef statute were introduced by the amendment.

The remaining contention to be considered is that neither Hanson nor Mary Ryan, Sr. was interested in or affected by the conversion action against the other, and therefore each action was an independent suit which did not affect all the parties to the action. Again the question must be resolved adversely to defendants. The subject matter of the action is to restore the misappropriated assets. All persons who participated in the diversion have by their conduct interested themselves in this action. Both Mary Ryan, Sr. and Hanson were participants in the program to divert the assets for the benefit of those in control. There is but one general right claimed which affects all the parties, including Mary Ryan, Sr.

and Hanson, and that is sufficient to overcome the objection raised. It is not required that all the parties be affected alike or be under the same obligation or be charged with the same liability. Kaiser v. Butchart, 200 Minn. 545, 274 N. W. 680, 113 A. L. R. 847; Bacich v. Northland Transp. Co. 173 Minn. 538, 217 N. W. 930. Nor is it fatal that the defendants are in a measure separately or independently involved. Venner v. G. N. Ry. Co. 117 Minn. 447, 453, 136 N. W. 271, 273. The amendment does not violate the joinder statute and was within the discretion of the trial court.

█ The trial court ordered a recovery of excessive salaries against Mary Ryan, Sr., Richard, Harry, and Emmett Ryan. Defendants insist that the action of the court was entirely unjustified. At the time Patrick Ryan died he was drawing a yearly salary of $22,000. Mrs. Ryan succeeded her husband as president. It appears from the record that Patrick Keough suggested that she succeed to this office. In 1934 Mrs. Mary Ryan, Sr. drew $19,000 in salary. Three thousand dollars was paid by the corporation to a man Mrs. Ryan engaged as manager. In 1935 and 1936 Richard, Harry, and Emmett Ryan each were given $8,000 per year. Their salaries were fixed by Mrs. Ryan in the first instance. It is claimed that the salaries for 1936 were set by the board of directors, but the court below found otherwise. In 1935 and 1936 the accounts do not show that anything was paid to Mrs. Ryan. The trial court held that Mrs. Ryan was entitled to $3,500 for 1934 and Richard, Harry, and Emmett each $5,000 per year.

Naturally courts are not prone to interfere with corporate salaries. The principles which must serve as guides when such action is demanded have often been stated. Seitz v. Union B. & M. Mfg. Co. 152 Minn. 460, 464, 189 N. W. 586, 27 A. L. R. 293; Schmitt v. Eagle Roller Mill Co. 199 Minn. 382, 272 N. W. 277. Further repetition is unnecessary. On the evidence presented, we think that the trial court as a matter of law was correct in making the reduction. Even assuming that Mrs. Ryan, as successor to her husband, had authority to fix salaries, they cannot be placed at figures which cause unreasonable and excessive payments to be made over objection of the unsalaried group. The payment of $19,000 to Mrs. Ryan was

grossly disproportionate to the value of the services rendered. She was lacking in business training and experience. As contrasted with her husband, a man of unusual ability, intimately familiar with the corporate affairs, her worth to the corporation obviously did not even closely approximate his. Her participation in the affairs seems to have been in form rather than in fact. She conducted whatever business she did. entirely from her residence and did not during the time she drew the salary go to the office of the milk company. On her own testimony, the court was justified, as a matter of law, in reducing the salary drawn by her. To have failed to do so would have been a gross injustice.

As for Richard, Emmett, and Harry Ryan, the trial court was liberal. It would be a travesty upon justice to permit these youths to retain total salaries of $24,000 a year. Far more than just disagreement with the worth of the individuals is presented in the plaintiffs' cause. It is made clear that the salaries were resorted to as a means of draining the funds. We have carefully examined the record and conclude that the trial court was not in error. The majority cannot, in effect, give away the corporate property against the interest of the minority. Rogers v. Hill, 289 U. S. 582, 53 S. Ct. 731, 77 L. ed. 1385, 88 A. L. R. 744.

"If the officers, acting as they do in a fiduciary capacity, fix exorbitant and unreasonable salaries so as to absorb earnings which should go in dividends or remain with the company as surplus, they are not exercising the fidelity which the law requires and a court of equity will give relief at the suit of a minority stockholder by compelling restoration." Seitz v. Union B. & M. Mfg. Co. 152 Minn. 460, 464, 189 N. W. 586, 587, 27 A. L. R. 293.

■ It is claimed that the salaries as paid were ratified by resolutions passed by the directors and stockholders in their respective meetings in 1936, and that the 1936 salaries were authorized by the directors. The corporate minutes show that at the annual meeting of stockholders held March 16, 1936, a resolution was adopted providing that: "All disbursements shown on the books of the Corporation heretofore for dividends, salaries, and all other pur-

poses were ratified, approved, and confirmed, as well as all action heretofore taken in behalf of the Corporation by its officers." A similar resolution was supposed to have been passed (there is no direct finding either way) at the directors meeting the same day.

At the time this resolution was claimed to have been adopted the corporate books contained a record of the fraudulent transactions involved in the salary suit, the salaries litigated in this action (except those for the latter part of 1936) and a credit to Mary Ryan, Sr., on December 31, 1934, for $600 for expenses never incurred, and another on September 12, 1935, for $232.60, as cash supposed to have been paid to the corporation but which was not in fact so paid.

The trial court found that when the ratifying resolutions were passed, if passed at all (no direct finding was made), J. D. Keough, who holds Patrick Keough's stock as trustee, was not advised and did not know and had no suspicion of the existence of these fraudulent and improper entries and believed those actively conducting the corporate affairs to be honest.

Obviously at the stockholders meeting J. D. Keough voted in his capacity of shareholder, if such a vote was taken. For purposes of decision, we will regard it as having occurred despite the lack of a finding below, for it will not alter the result in any event. He was not one of the voters who was aware of the misappropriations. Ratification must be made with full and complete knowledge of all the material facts, and "this rule applies, of course, to ratification by a corporation of an unauthorized contract or other act by its officers or agents, whether the ratification is by the stockholders or by the directors, or by a subordinate officer * * *." 2 Fletcher, Cyc. Corp. (Perm. ed.) § 756, p. 780; 2 Dunnell, Minn. Dig. (2 ed.) § 2116, p. 264; Thompson v. North Star Muskrat Farm, Inc. 183 Minn. 314, 236 N. W. 461. A valid ratification depends upon actual knowledge of the stockholder. Iback v. Elevator Supplies Co. Inc. 118 N. J. Eq. 90, 177 A. 458; Alward v. Broadway G. M. Co. 94 Mont. 45, 20 P. (2d) 647. Nothing indicates that the vote was cast in disregard of the facts which should have caused inquiry. Actual knowledge and not merely the opportunity to se-

cure it is the controlling factor here. 2 Fletcher, Cyc. Corp. (Perm. ed.) § 757, p. 788. The vote of the other shareholders was made with knowledge of the fraudulent items and the abuses prevalent in the corporate management. They were in effect attempting to ratify their own oppressive action in disregard of the minority.

"While stockholders in a corporation owe the duty of good faith to each other in the management of the affairs of the corporation, they do not stand to each other in a fiduciary relation within the rule we have stated. * * * The fact that he may have a personal interest, separate from the others or from that of the corporation in the matter to be voted upon, does not affect his right to vote. *It is not to be understood that the majority stockholders may use their power of voting for the purpose of defrauding the minority.*" Bjorngaard v. Goodhue County Bank, 49 Minn. 483, 487, 52 N. W. 48, 49. (Italics supplied.)

It is only the honest policy and not the dishonest policy against which the minority cannot complain. See Schmid v. Ballard, 175 Minn. 138, 142, 220 N. W. 423. The stockholders' ratification is not a bar.

Nor was the adoption, if made, of the blanket resolution by the directors of any greater validity. The vote by Keough was cast, if cast at all, without knowledge of the actual situation. We need not discuss the rules respecting knowledge of directors when parties outside the corporate organization are involved, for it is clear that the situation here involves intra-corporate parties only. Consequently the actual facts should govern rather than presumptions. The vote cast by James Keough was ineffective. Whitewater Tel. Co. v. Cory, 117 Kan. 463, 466, 232 P. 609, 610. (Action to recover $600 irregularly received as salary by defendant, an officer and director.) The court said:

"But the board of directors knew nothing of such arrangement, nor indeed was there any evidence that the other individual directors knew of it, so all argument based on the law of ratification of unauthorized acts is beside the point."

In Thompson v. North Star Muskrat Farm, Inc. 183 Minn. 314, 316, 236 N. W. 461, 462, the question of ratification was involved. The vote recognizing the employment of plaintiff was by the three stockholders also acting as directors. The vote was taken without knowledge of a stipulation for certain compensation made by one of the directors and stockholders with the plaintiff. The court said:

"Without knowledge by the directors of all the essential conditions of that agreement, it cannot be said that there was any ratification of all such conditions."

For a complete discussion see 2 Fletcher, Cyc. Corp. (Perm. ed.) § 750, et seq.

The vote does not appear to have been cast with a disregard of what may have been contained in the corporate accounts. The other directors, participators in the frauds which drained the assets, cannot by their vote destroy the right of the plaintiffs. If the rule were otherwise frauds could be perpetrated with complete impunity by the group in control no matter how oppressive the result might be to the minority.

There is no estoppel arising out of the vote cast, for the simple reason that no possible prejudice accrues to the defendants. They are receiving every cent which is justly due them for services rendered.

The trial court found that the only mention of salaries as to the three Ryan men for 1936 was after the meeting was adjourned and no formal action was ever taken. The evidence sustains this finding. Consequently it was proper to order a reduction of the 1936 salaries.

Objection is made to the admission in evidence of testimony of the witnesses Larson, Carlson, and Bock as to the value of the services of Richard, Harry, and Emmett Ryan. The objection seems to be that no consideration was given by these witnesses to the executive services claimed to be rendered to the corporation by these men. The trial court primarily determines the qualifications of a witness offered as an expert. Althoff v. Torrison, 140 Minn. 8, 167 N. W. 119; 2 Dunnell, Minn. Dig. (2 ed. & Supps.) § 3335.

There can be no serious objection to the court's determination that these witnesses had sufficient qualifications to testify as experts. The Ryans and Hanson fully testified as to the character of the work done by them. The expert witnesses on cross-examination each disclaimed any inclusion of executive services as an element in their computation, testifying that they did not think the work done involved such services. This was adequately brought to the court's attention. Salaries were allowed considerably in excess of the general opinion of these witnesses as to the worth of the services. The court clearly understood their qualifications and the basis of their opinions, and we can see no reversible error. Likewise, we think it was not error to receive the testimony of Stoffer, the plaintiffs' accountant, as to the amount of working capital and surplus necessary for the defendant corporation to have. His qualifications were passed upon by the court, and such opinion as was given was undoubtedly viewed in the light of the extent of experience that the witness had had with corporations of this character.

■ Plaintiffs sought to have the court order the necessary steps to be taken for the declaration of a cash dividend. The court below ordered that $131,450.58 be disbursed among the shareholders. Defendants predicate error upon this.

The principles which should mark the course of the court in determining whether or not a dividend may be compelled over objection of those in control of corporate affairs are well established without serious dissent, and our cases adequately discuss the question. Briefly it may be said that the determination whether or not a dividend should be declared is essentially a matter of internal management. It is primarily for the corporate directors in their sound discretion to decide. Schmitt v. Eagle Roller Mill Co. 199 Minn. 382, 272 N. W. 277; Stevens, Corporations, § 99, p. 387; 21 Minn. L. Rev. 849; Anno. 55 A. L. R. 8, 44. But their powers are not unlimited, and judicial review may be secured when abuses contravening the shareholders' rights manifest themselves. Ordinarily a court will not compel a dividend unless the directors act fraudulently, unjustly, or unreasonably so as to impair the rights of the

complaining stockholders to their just proportion of corporate profit. Schmitt v. Eagle Roller Mill Co. 199 Minn. 382, 272 N. W. 277; Seitz v. Union B. & M. Mfg. Co. 152 Minn. 460, 189 N. W. 586, 27 A. L. R. 293; Anderson v. W. J. Dyer & Bro. 94 Minn. 30, 101 N. W. 1061, all illustrate the principle. Generally, the mere fact that a large corporate surplus exists is not enough to warrant equitable intervention. Trimble v. American Sugar Ref. Co. 61 N. J. Eq. 340, 48 A. 912; Marks v. American Brewing Co. 126 La. 666, 52 So. 983. Ultimately the test resolves itself into an examination of the good faith and reasonableness of the policy of retaining that which otherwise is available for dividends. Stevens, Corporations, § 99, p. 389.

Before we apply these principles, the facts of this case, being somewhat peculiar, must be related in detail. The business, assets, and liabilities of the partnership were exchanged in 1917 for 597 shares of the St. Paul Milk Company of $100 par value. The original authorized capital was $100,000 with the right to engage in business when paid-in capital amounted to $50,000. The 597 shares represent the only stock issued until the stock dividend, subsequently discussed, in 1936. In November, 1930, the outstanding capital stock was reduced to $41,200 when the corporation purchased from P. J. Keough 185 of his shares. By amendment in 1936 the authorized capital was increased to $300,000. A six-to-one stock dividend was declared, and the amount necessary to cover the issued shares (2,472 at $100 par or $247,200) was transferred from the surplus account to the capital account. This dividend increased the number of outstanding shares to 2,884, making a total capital of $288,400.

From December 15, 1924, when the corporation paid its first dividend, until October 22, 1935, $169,470 was distributed among stockholders or about a 335 per cent return. In addition, there was the stock dividend and a cash dividend of ten per cent on all the shares, new and old.

On December 31, 1936, the corporation had investments of $128,168.72, including $99,861 in government bonds, and $16,003 in the common stock of the wholly owned subsidiary, the South St.

Paul Dairies, Inc. The following figures are fairly representative of the business of the corporation in recent years:

|  | 1933 | 1935 | 1936 |
|---|---|---|---|
| Net merchandise sales - - - | $794,000 | 1,090,000 | 1,166,000 |
| Average per month - - - - | 66,166 | 90,833 | 97,166 |
| Cost of merchandising - - - | 368,400 | 592,000 | 653,000 |
| Average per month - - - - | 30,700 | 49,333 | 54,416 |
| Gross profits - - - - - - - | 425,000 | 498,000 | 511,000 |
| Average per month - - - - | 35,416 | 41,500 | 42,583 |
| Expense of doing business - - | 403,600 | 451,300 | 485,400 |
| Average per month - - - - | 33,580 | 37,608 | 40,450 |
| Monthly sum for purchase of merchandise and depreciation and expenses - - - - - - | 64,280 | 86,941 | 94,866 |
| Accounts receivable - - - - | 47,000 | 53,000 | 50,000 |
| Capital and surplus - - - - | 363,135.29 | 438,322.14 | 435,491.73 |

The record does not disclose any mortgages or liens against the corporate property or any other substantial indebtedness. The sales are predominantly on a cash basis. The merchandise inventory is small; for example, on December 31, 1935, it was $5,649.85. There have been sufficient accounts set up to cover depletion and obsolescence. The buildings, plant, and equipment are adequate for the business and in good condition. The union scale of wages is paid.

The trial court found that a liberal and most reasonable capitalization and surplus was the sum equal to the original outstanding capital stock ($41,200) plus two-thirds of the accumulated surplus as of December 31, 1936 (this figure was set at $394,291.73 including in it the $247,200 transferred from the surplus account to the capital account when the capital structure was increased in 1936). The court found that $304,061.64 surplus and capital was sufficient and held that all sums in excess were unreasonable and constituted a "violation of the fiduciary relation existing between the officers and directors of said corporation and its stockholders and is fraudulent, oppressive, unreasonable, and unjust." A dividend was ordered totaling $131,450.58, which consisted of the amount repre-

senting what the court deemed to be held as excess capital and surplus on December 31, 1936, plus $16,332.60 overpaid to Mary Ryan, Sr., $18,000 overpaid to Richard, Harry, and Emmett Ryan, and $12,369.97 due the corporation by its wholly owned subsidiary, the South St. Paul Dairies, Inc.

After the stock dividend and cash dividend of ten per cent in 1936, the surplus account was on December 31, 1936, actually $147,091.73, determined by subtracting from the net surplus of $703,601.73 the charges against that account for dividends in cash and the amount capitalized by the stock dividend, totaling in all $556,510.

Plaintiffs base the right to have a dividend order declared upon the premise that those in charge of corporate affairs are wrongfully and needlessly withholding profits available for cash dividends and conspiring to retain them for their benefit and to the prejudice of the minority.

It is urged that oppression and breach of duty are evident from several acts which, it is asserted, exemplify the attitude and purpose of the Ryans with respect to the corporation. Greatest reliance is upon the capitalization in 1936 by the Ryans with Hanson's coöperation of a large percentage of the accumulated surplus without reason or necessity other than to keep it within the corporation under the dominating control of the Ryans. Plaintiffs were met with the claim that the capitalization was for the purpose of avoiding possible federal taxes upon undistributed surplus reported by newspapers to be in the offing. However, in answer, it was asserted that the proposed tax did not contemplate taxing accumulated undistributed surplus garnered prior to January 1, 1936. The court below found that the capitalization was to strengthen the control of the Ryans over the corporation and surplus and to prevent a distribution so as to deprive the minority of a fair part of the earnings. It seems clear that, in the light of the facts, the corporation did not have a reasonable need for the large surplus accumulated and held as bonds or other easily liquidated assets in December, 1936. The merchandise inventory was small with an almost daily cash turnover. There were no substantial obligations

to be met. The evidence does not disclose any immediate expansion program. Accounts for obsolescence and depreciation were adequately set up. In short, the surplus was easily available for dividends if the directors so elected. We need not discuss the question whether, standing alone, this would have been sufficient ground to order a dividend. Other facts make the case clear. The proposed tax could as easily have been avoided by the dispersion of accumulated surplus as by its capitalization. The large surplus mentioned existed at the time Mary Ryan, Richard, Harry, and Emmett Ryan were receiving salaries in excess of their worth and draining from the corporation money otherwise available for dividends. Likewise, milk and other creamery products were being converted by the Ryans and by Hanson at the rate of $25 each per month. Furthermore, certain fraudulent expense items in favor of Mary Ryan, Sr. were present upon the corporate accounts. Viewed in light of these facts, the spectacle takes on a distinct color of fraud and bad faith. The capitalization of the surplus did not serve a corporate need; it was referable only to the desires and purposes of those in control to keep the surplus under their control and subject to their machinations. Generally, directors are the proper parties to determine whether a dividend shall be in cash or by stock, and a court will not interfere with the fair exercise of their discretion; but where it appears from the evidence, as here, that the object was to benefit primarily those in whom the discretion rests, equitable powers can be called into operation by proper application. Directors and officers of a corporation owe stockholders the active duty of honesty and good faith in the transaction of the business of the corporation and in their dealings with it. "While it is true that the courts cannot ordinarily compel a corporation to declare a dividend at the suit of a minority stockholder, yet it is not to be doubted that where dividends are withheld for an unlawful purpose—to deprive a particular stockholder of his rights—he may have the aid of equity for adequate protection." Anderson v. W. J. Dyer & Bro. 94 Minn. 30, 35, 101 N. W. 1061, 1062. The record discloses a variety of actions, such as increasing the board of directors, whereby the Ryans with Hanson's

aid and support have sought to grip the control so that their actions can be approved or go uncontested irrespective of their oppressive nature.

We recognize that the surplus capitalized must be regarded as capital since, having been transferred to the capital account, it of necessity becomes a part of it and becomes characterized by its attributes. However, this does not prevent an equitable determination of the question here presented. The stock dividend actually accomplished a change in form and not in substance. "A stock dividend really takes nothing from the property of the corporation, and adds nothing to the interests of the shareholders. Its property is not diminished, and their interests are not increased." Gibbons v. Mahon, 136 U. S. 549, 559, 10 S. Ct. 1057, 1059, 34 L. ed. 525, 527. Where profits clearly warrant payment of a dividend and the condition of the business is such that payment would be proper, the stockholders cannot be cut off by a stock dividend when its purpose is wrongfully to keep the profits of the business within the control of those dominating the affairs so as to be available to them. Such action is oppressive and evinces a bad faith sufficient to justify equitable intervention. The facts disclosed herein present a situation in which the creditors are not in the slightest degree concerned.

The trial court refused to order proceedings to vacate the capitalization although it was found to have been irregularly accomplished. There is no appeal from this. After the increase in capitalization we cannot regard the surplus account as being, as of December 31, 1936, larger than $147,091.73. However, this is sufficient to provide funds to make up the sum ordered paid, over and above that recovered from Mary Ryan, Sr. and her sons, and to be paid by South St. Paul Dairies, Inc. The readily available assets turned into the capital account at the time the surplus was transferred to capital makes the retention of the present surplus wholly unnecessary even to meet an emergency. We think the trial court must be sustained. We have considered the other contentions such as laches, ratification, and acquiescence, but do not regard them of sufficient merit to justify further discussion.

■ Motion is made to dismiss the appeal of the St. Paul Milk Company. There can be no doubt as to the logic of the contention made by plaintiffs that the St. Paul Milk Company is the real beneficiary of the representative suit and is in no sense an "aggrieved party." On appeal it cannot be regarded as the real party adversely affected. But it must be conceded that the position of the corporation in a representative suit is anomalous. The corporation should be a party, and, for this reason, despite the logical implications, we deny the motion. However, costs will not be allowed against the corporation.

### STOCK DIVISION SUIT.

The action designated as the "stock division suit" is for the cancellation of 13½ shares of stock in the St. Paul Milk Company now held by the Ryans and for the issuance to plaintiff P. J. Keough of 13½ shares. The alleged cause of action is predicated upon the assertion that in the original division of the stock in 1917 Patrick Ryan defrauded P. J. Keough of this number of shares. The lower court made findings of fact and conclusions of law favorable to the plaintiffs.

■ The dispute on this appeal resolves itself into a determination of the respective amounts contributed by the partners, for upon this depends the validity of the plaintiffs' claim. Plaintiffs alleged that the contributions were $20,000 by the Keoughs, $15,000 by Ryan, and $5,000 by Hanson. P. J. Keough, having acquired his brother's interest, according to this ratio would be entitled to one-half of the issued stock.

The records of the partnership are unfortunately meager. There is, however, a closing statement prepared by Ryan at the time shortly before the partnership assets were turned over to the corporation which lists partnership assets at $59,700, owned as follows:

| | |
|---|---|
| P. J. Keough | $28,500.00 |
| P. J. Ryan | 24,000.00 |
| P. A. Hanson | 7,200.00 |
| | $59,700.00 |

On the other hand, the minutes of the first corporate meeting, held March 15, 1917, are relied upon by the plaintiffs. They state:

"The first order of business was the purchase of the property * * * known as the Casey Pure Milk Company, on May 13, 1916. The price paid was fifty-seven thousand dollars.

"The company assumed the mortgage of twenty-three thousand dollars against said property. The amount paid by each member was as follows: P. J. Ryan, fifteen thousand dollars, P. J. Keough, twenty thousand dollars, and P. A. Hanson five thousand dollars."

The evidence satisfactorily establishes that the division of the stock was left by Keough and Hanson entirely to Ryan. Both relied upon him to make a correct and honest division that would maintain the same respective interests as had existed in the partnership.

It will be recalled that 285 shares were issued to P. J. Keough, 240 shares to Ryan, and 72 shares to Hanson. It is claimed that the division should have been, Keough, 298½ or one-half of the 597 shares issued, Ryan 223⅞, and Hanson 74⅝. The basis of this suit is that Ryan procured 13½ shares by fraud which rightfully belonged to plaintiff P. J. Keough.

The finding was made that during the operations of the partnership profits of $19,700 accrued. This, added to the original total contributions of $40,000, totaled the amount for which capital stock was issued, despite the statement in the minutes. The ratio of contribution, 20-15-5, advanced by plaintiffs prevailed below. Defendants assert that the burden of proof has not been sustained.

Clearly, unless the case can stand upon fraud, it must of necessity collapse because the general statute of limitations has run. The rules regarding the nature of proof that must be adduced are not disputed. The cardinal principles are that fraud cannot be established by equivocal evidence, that is, evidence equally consistent with honest intention, Sprague, Warner & Co. v. Kempe, 74 Minn. 465, 77 N. W. 412; nor is the mere proof of suspicious circumstances adequate, see Silliman v. Dobner, 165 Minn. 87, 92, 205 N. W. 696. However, where the parties are in a confidential rela-

tionship, fraud is more readily found.  In many instances, such as here, the surrounding facts must be resorted to in order to determine whether certain specific action was fraudulent in character.

The evidence relied upon for the finding in plaintiffs' favor can be briefly discussed.  The first item, the minutes of the first corporate meeting, sustains the contention of the plaintiffs.  Much effort has been made to show the minutes relied upon to be a mass of inconsistencies.  Conceding that the inaccuracies which cannot be satisfactorily explained reflect unfavorably, yet the other evidence produced substantiates the contents as to the amount contributed by the various partners.  For example, Hanson, who testified on cross-examination under the statute, gave the following testimony:

Q.  "When that partnership was formed between you four men, there was a contribution to the capital of the partnership, was there not?

A.  "Yes, sir.

Q.  "How much did each of you contribute?

A.  "Mr. Ryan contributed fifteen thousand; J. D. Keough, ten thousand; P. J. Keough, ten thousand; and I contributed five thousand * * * in equipment. * * *

Q.  "Well, with that money what did you do?

A.  "We bought out the Casey Milk Company."

Later Hanson testified that the minutes of the first corporate meeting correctly stated the amounts "contributed by the different incorporators to that corporation."  He also said that to his knowledge none of the other incorporators ever contributed any more. Both of the Keoughs, whose credibility must have been favorably regarded, testified to the same effect.  James Keough stated that Ryan never told him that he had put any additional funds into the partnership.

Against this the defendants have produced the closing statement of the partnership drafted by Ryan, which gives the respective interests as Keough, $28,500; Ryan, $24,000; and Hanson, $7,200. This statement stands alone with nothing more to show that it is

true and correct as to the interests of the partners. Clearly, the total assets were $59,700, but the only thing which shows they were owned in the proportion asserted is this statement drawn up by Ryan, which Keough never saw and which it is likely Hanson did not see, although on the latter point the evidence is not clear-cut. In the event the interests were not 20-15-5, it seems clear that Hanson, an experienced businessman, would not continue under such a delusion if the Ryan statement were correct. Ryan was a man versed in business, and there does not seem to be much ground for doubt that if his interest were greater than $15,000 he would have protected it in the corporate minutes of the first meeting, which he undoubtedly dominated. The minutes represent a time subsequent to the date the closing statement of the partnership was drawn up.

The record which is before us comprises three cases. Yet it must be considered as presenting one broad factual situation. The frauds on P. J. Keough which occurred in the corporate enterprise reflect a shadow which is unfavorable to the contentions of the defendants. The division was left to Ryan, and both the other partners testified that they trusted him to make a proper division. The parties were partners, and while activities were in progress to transform the partnership into a corporation the close relation previously existing, plus the actual confidential relation arising from the situation of the parties, imposed upon Ryan a duty with which equitable powers will command compliance. The stock division was entirely discordant to that which the partners testified it should have been. Defendants argue, however, that even assuming the original relation was 20-15-5, yet there is nothing on which to base an assumption that it continued to the end of the partnership. A partnership has as its basis a contract. The respective interests of each could only be altered by a modification of it, and Ryan by himself alone could not accomplish such an alteration. If a change occurred, it would have been known to the others. The finding below is sustained.

It is not conclusive therefore that plaintiffs are barred by the statute of limitations. 2 Mason Minn. St. 1927, § 9191(6), controls. Failure to discover the fraud sooner is justified upon the same reasoning as that presented in the salary suit. To this may be

added the fact that Hanson, who was well acquainted with the corporate affairs and business in general, did not discover that he too had been duped out of 2⅝ shares.

The result is not affected by the claim that, being a director, Keough is conclusively presumed to have had knowledge of the division. Whatever may be the rule with respect to third persons, as between members of a close corporation we see no reason why rights should be adjusted by such artificial reasoning.

██ The remaining objection presented by defendants is the doctrine of laches. As hereinbefore stated and for the same reasons, it is primarily for the trial court to determine as a question of fact, whether the doctrine should be applied. Ignorance with justification is a recognized excuse for delay, and such a situation could be reasonably found to have been presented here. In cases of fraud the delay occasioned, as here, by ignorance arising largely because of the confidential relationship and respect for integrity should not be dealt with lightly, and there should be a clear case presented before a court should at the instance of the beneficiaries of the fraud deny to the defrauded party what is his enforceable legal right. "The pith of the doctrine of laches is unreasonable delay in enforcing a known right." 4 Dunnell, Minn. Dig. (2 ed.) § 5351, p. 68. Excusable ignorance is vital in determining laches. McClintock, Equity, § 26, p. 39. When the right became known prompt action was adopted. Aside from Ryan's death, there is no prejudice in the delay. The trial court may well have considered that this circumstance was outweighed by those considerations favorable to plaintiffs. The evidence does not compel a finding of laches.

· ██ Objection is made to the ruling whereby James D. Keough was permitted to testify as to conversations with Patrick Ryan, now deceased. There was no violation of 2 Mason Minn. St. 1927, § 9817 (discussed in the salary suit). The statute disqualifies a party or any person interested in the event thereof from testifying. The statute, excluding otherwise competent testimony, must be strictly construed. The conversation reported by James D. Keough related only to matters material in the stock division suit. While James D. Keough is a party to the record, he is in no sense a party

"interested in the event thereof" within the rules laid down. His trust agreement with Patrick did not cover these 13½ shares or relate in any way to the matter of the stock division. The conclusions of law and the order for judgment gave legal and equitable title to the 13½ shares to Patrick J. Keough. James Keough did not and could not receive anything in this action. While he is a party to the record, he is not a party to the issue with respect to which he related the conversation because it in no way concerns him.

"On its face the statute disqualifies every person who is made a party to the record. The application of this language has been limited to those persons who are properly joined as parties (Towle v. Sherer, 70 Minn. 312, 73 N. W. 180), and further limited to those of the proper parties to the record who are parties to the issue." Exsted v. Exsted, 202 Minn. 521, 527, 279 N. W. 554, 559, 117 A. L. R. 554.

"No good reason can be suggested for excluding the testimony of one who, although a party to the action for some other purpose, is not a party to, or interested in, the issue to which his testimony relates." Bowers v. Schuler, 54 Minn. 99, 103, 55 N. W. 817.

In the representative suit (No. 31,833) and the stock division suit (No. 31,832) the orders are affirmed.

In the salary suit (No. 31,834) the order is modified by eliminating recovery of the item of $994.36 for salary in 1930. In other respects the orders in the salary suit (Nos. 31,834 and 31,847) are affirmed.

Defendant will be allowed no statutory costs in the salary suit.

MR. JUSTICE HILTON, incapacitated by illness, took no part.

ON APPEAL FROM TAXATION OF COSTS.

On May 17, 1939, the following opinion was filed:

PER CURIAM.

Two appeals from the taxation by the clerk have been filed. In the representative suit, case No. 31,833, costs and disbursements should not have been taxed against the corporation. Separate statu-

tory costs will be allowed in the representative and stock division suits.

So ordered.

